UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALI AL-AHMED,<br><br>                              Plaintiff,<br><br>              v.<br><br>TWITTER, INC.,<br><br>                              Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> Index No.: _____ |

Plaintiff Ali Al-Ahmed (hereinafter, "Plaintiff" or "Mr. Al-Ahmed") by and through his attorneys, Gerstman Schwartz LLP, as and for its Complaint against Defendant Twitter (hereinafter, "Defendant" or "Twitter"), hereby alleges as follows:

## JURISDICTION & VENUE

1.      Jurisdiction is proper in this court because this litigation arises under federal law, namely 18 U.S.C. §2701 et seq. (Violation of the Stored Communications Act). The Court has jurisdiction over this action under 28 U.S.C. § 1331.

2.      The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367, and 28 U.S.C. § 1362 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c) because Defendant resides in this district insofar as it maintains a sprawling, 12-floor corporate headquarters (its second largest office) located at 245 West 17th Street in Manhattan—a news and media mecca—in deference to New York City as a global media market.

4.     While venue is proper in New York, California law is applicable under New York's "interests analysis" approach insofar as a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in California. *See Belmac Hygiene, Inc. v. Medstar, Inc.*, 121 F.3d 835, 838 (2d. Cir. 1997); *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342 (1991).

## PARTIES

5.     Plaintiff Ali Al-Ahmed is one of the leading political dissidents to the Kingdom of Saudi Arabia (hereinafter "KSA") who resides, and has been granted asylum in, the United States because he faced imminent persecution were he to return to his native country, Saudi Arabia.

6.     Defendant Twitter is a Delaware corporation with its principal place of business located in San Francisco, California and its second largest corporate headquarters located at 245 West 17th Street, New York, New York. Twitter conducts business throughout the United States, including New York.

7.     In 2011, Saudi Prince Alwaleed Bin Talal (hereinafter, "Bin Talal") purchased $300 million worth of stock in Twitter.  In 2015, Bin Talal made an additional investment, owning 5.2% of the company, more than Twitter's founder and CEO.  A January 29, 2018 article in the British newspaper, *The Daily Mail*, reported that after being imprisoned and perhaps tortured by KSA, Bin Talal signed over many of his assets to Crown Prince Mohammed Bin Salman (hereinafter, "MBS").  According to *The Daily Mail*, a deal was allegedly made with MBS allowing MBS to seize control of these assets and those of other princes, so long as the assets remained in the United States.

8.     Plaintiff is informed and believes, and based thereon alleges, that since late 2017 or January of 2018, MBS has exercised control over more Twitter stock than is owned by Twitter's founder, Jack Dorsey. Twitter also failed to properly safeguard Plaintiff's account, and as a result,

personal and highly sensitive information was disclosed to third parties including, but not limited to, the KSA and its agents.

## PRELIMINARY STATEMENT

9.     This is an action to vindicate the rights of Ali Al-Ahmed, a political refugee who has been granted political asylum in the United States from the despotic regime in the Kingdom of Saudi Arabia. Because of the tremendous wealth of key figures in KSA, major corporations, including Twitter, Inc., have enabled, collaborated with, aided and abetted, and turned a blind eye to KSA's efforts to suppress, torture, falsely imprison, terrorize, and murder dissenters both within Saudi Arabia and around the world.

## FACTS

### Facts In Common to All Causes of Action

10.     Mr. Al-Ahmed is a leading voice of dissent casting an evidently unwanted magnifying glass upon the acts and omissions, policies and, at times, alleged crimes conducted on behalf of, or with the knowledge and consent of, the Kingdom of Saudi Arabia ("KSA") or elements within the KSA. Mr. Al-Ahmed is also one of the most active and courageous journalists within the United States covering the KSA.  Through his prominent social media presence, and persistent critique of the KSA, Mr. Al-Ahmed has brought broad awareness to issues of social and political concern including allegations of KSA human rights violations, KSA links to international terrorism, and KSA corruption within the Kingdom.

11.     It would not be an overstatement to suggest that Mr. Al-Ahmed has become a thorn in the side of the KSA. Indeed, he would not dispute that he has made it his life's work to counter KSA propaganda and expose systemic corruption, violence, and police state tactics within the KSA, and to counter KSA efforts to miscast itself as a modern nation. As a result, Mr. Al-Ahmed attests that the KSA has consistently attempted to—quite literally—silence his voice, even going

so far as to attempt to kidnap and kill him on multiple occasions. The KSA has also formally stripped Mr. Al-Ahmed of his Saudi nationality and has kept him under vigilant surveillance.

12.     He has been invited to speak by institutions including Princeton University, Amnesty International, the Hudson Institute, American Enterprise Institute, and Meridian International Center and has testified before Congress on several occasions on the issue of civil rights and religious freedom in the Middle East. He has authored reports on Saudi Arabia regarding religious freedom, torture, press freedom, and religious curriculum.

13.     Although Mr. Al-Ahmed usually disseminates information via social media, Al-Ahmed is a frequent consultant to major international broadcast media on issues including Saudi political affairs, terrorism, Sunni-Shi'a relations, Wahhabi Islam, political and religious oppression, human and women's rights in Saudi Arabia, and the Saudi-U.S. relationship. He has been a regular guest on CBS News, CNN, PBS, Fox News, and Al-Jazeera. He has written for, and has been quoted in, the Washington Post, Associated Press, The Times, Reuters, the Wall Street Journal, USA Today and the Boston Globe. In short, he is a leading Saudi voice for KSA reform and democratization.

14.     With the passage of time, Mr. Al-Ahmed has become such an influential voice that multiple prominent Saudi officials have followed his Arabic Twitter, his largest verifiable social media account, which has over 36,000 followers worldwide (although, as will be described in further detail herein, it has since been suspended).

### Alzabarah's and Abouammo's Unauthorized and Unlawful Access of Mr. Al-Ahmed's Private Information

15.     In or around August 2013, until in or around December 2015, Ali Hamad Alzabarah (hereinafter, "Alzabarah ") and Ahmad Abouammo (hereinafter, "Abouammo"), Twitter

employees charged by the United States government with being KSA spies,[1] accessed the company's information on an array of Saudi dissidents including Mr. Al-Ahmed.

16.     Through use of both Alzabarah and Abouammo, the KSA was successful in using Twitter's internal resources to identify Mr. Al-Ahmed as a critic of the government and ultimately silence him.

17.     On numerous occasions, Alzabarah and Abouammo mined Twitter's internal systems for, *inter alia*, personal information regarding Mr. Al-Ahmed, email addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses.

18.     According to the Twitter "Playbook," which outlines the policies Twitter employees must abide by, Alzabarah and Abouammo were prohibited from engaging in outside employment or consulting "or other business activity that would create a conflict of interest with the company."[2] Certainly, acting as spies, foreign agents and purveyors of assignation would be prohibited. Twitter's Employee Invention Assignment and Confidentiality Agreements with both Alzabarah and Abouammo reinforced "a relationship of confidence and trust" between Twitter and each of them with respect to any information of a confidential nature or secret nature that may be disclosed over the course of their employment with the company.[3]

19.     Neither Alzabarah nor Abouammo's job duties included a need to access Mr. Al-Ahmed's private information.  The fact that they did so was a serious and reportable violation of the Twitter Playbook polices regarding safeguarding user data. Although Twitter belatedly attempted to remedy their indefensible security practices, the damage to Mr. Al-Ahmed and his

---

[1] https://www.justice.gov/usao-ndca/press-release/file/1215976/download
*UNITED STATES v. AHMED ALMUTAIRI*, a/k/a AHMED ALJBREEN; and ALI ALZABARAH, November 2019.
[2] https://www.sec.gov/Archives/edgar/data/1418091/000156459017013336/twtr-ex101_6.htm
[3] *Id*.

followers had already been done. Twitters' subsequent efforts to enhance their security protocols does not undo the damage done to Mr. Al-Ahmed and his followers as a result of Twitter's slip shot practices which have made Mr. Al-Ahmed and many of his followers targets for the brutal KSA, jeopardizing the very lives of his followers living within the confines of the KSA and its surrounding environs.

20.   Indeed, several Twitter users, who either followed Mr. Al-Ahmed's Twitter account and/or had direct contact with him through the use of private messaging, have disappeared, been arrested, or have been executed. One such example is Abdullah al-Hamid, a Saudi Dissident and follower of Mr. Al-Ahmed's Twitter account, who was jailed and ultimately died in custody.[4]

21.   On the heels of all this death and skullduggery, on or about May 2018, the KSA managed to fully silenced Mr. Al-Ahmed when they had their embedded Twitter agents or others within Twitter suspend Mr. Al-Ahmed's Arabic Twitter account, "@AliAlahmed," without explanation or warning. Despite the above-noted Justice Department criminal complaint exposing these Twitter KSA agents' activities in November of 2019, Mr. Al-Ahmed's repeated attempt to appeal this suspension have been to no avail.

22.   Inexplicably, Twitter has upheld this suspension and kept his account inaccessible including Mr. Al-Ahmed's access to his approximately 36,000 followers' contact information. The genesis of this suspension having been clearly exposed, Twitter continues to bar Mr. Al-Ahmed from access or use presumably because Twitter is in league with the KSA; preferring access to the KSA over human rights, freedom and abiding by the terms of its owner agreements made with

---

[4] https://www.nytimes.com/2020/05/21/world/middleeast/abdullah-al-hamid-saudi-dissident-dies-in-detention-at-69.html

Twitter subscribers, and in contravention of its public representation that Twitter is committed to protecting Twitter uses.[5]

23.     Mr. Al-Ahmed spent many years of time and effort cultivating, developing and curating his expansive list of Twitter followers, which effectively amounted to valuable intellectual and proprietary property—particularly insofar as it earned him credibility, career nods and income—reflecting a huge number of persons interested in unvarnished coverage of KSA activities provided from a pro-democracy and pro-human rights vantage point.  Upon information and belief, some of Mr. Al-Ahmed's followers' accounts have also been shut down as a result of protesting his account suspension. This is not only immoral, it is undemocratic.

In pertinent part, Twitter, in its "Twitter Rules," states that,

> Twitter's purpose is to serve the public conversation. Violence, harassment and other similar types of behavior discourage people from expressing themselves, and ultimately diminish the value of global public conversation. Our rules are to ensure all people can participate in the public conversation freely and safely…Safety - Violence: You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence. Learn more about our violent threat and glorification of violence policies…

> Terrorism/violent extremism: You may not threaten or promote terrorism or violent extremism. There is no place on Twitter for terrorist organizations or violent extremist groups and individuals who affiliate with and promote their illicit activities. The violence that these groups engage in and/or promote jeopardizes the physical safety and well-being of those targeted. Our assessments in this context are informed by national and international terrorism designations. We also assess organizations under our violent extremist group criteria. Violent extremist groups are those that meet all of the below criteria: identify through their stated purpose,

---

[5] https://help.Twitter.com/en/safety-and-security/public-and-protected-tweets "About public and protected Tweets – Should you choose to protect your Tweets, you can do so through your account settings…If you protect your Tweets, you'll receive a request when new people want to follow you, which you can approve or deny…Protected Tweets: Only visible to your Twitter followers. Please keep in mind, your followers may still capture images of your Tweets and share them." Twitter thus created an illusion of security and safety relied upon by Plaintiff, and, according to Plaintiff, by those who were "disappeared," arrested or eliminated.

publications, or actions as an extremist group; have engaged in, or currently engage in, violence and/or the promotion of violence as a means to further their cause; and target civilians in their acts and/or promotion of violence. We examine a group's activities both on and off Twitter to determine whether they engage in and/or promote violence against civilians to advance a political, religious and/or social cause.

What is in violation of this policy? Under this policy, you can't affiliate with and promote the illicit activities of a terrorist organization or violent extremist group. Examples of the types of content that violate this policy include, but are not limited to: engaging in or promoting acts on behalf of a terrorist organization or violent extremist group; recruiting for a terrorist organization or violent extremist group; providing or distributing services (e.g., financial, media/propaganda) to further a terrorist organization's or violent extremist group's stated goals; and using the insignia or symbols of terrorist organizations or violent extremist groups to promote them. What is not a violation of this policy? We may make limited exceptions for groups that have reformed or are currently engaging in a peaceful resolution process, as well as groups with representatives who have been elected to public office through democratic elections. We may also make exceptions related to the discussion of terrorism or extremism for clearly educational or documentary purposes. This policy also doesn't apply to military or government entities.[6]

24.     Between Twitter's holding out that one can protect their Tweets, the above-referenced affirmative corporate and global commitment to "serve the public conversation," and Twitter's supposed opposition to violence and terrorism, Twitter's failure to screen and supervise its employees, thereby allowing KSA spies to embed in Twitter, makes a mockery of this so-called "commitment." It is a crying shame that individuals like the Plaintiff have detrimentally relied on same to their undying personal prejudice, particularly in the face of those who how have been

---

[6] https://help.twitter.com/en/rules-and-policies/twitter-rules

"disappeared," arrested or otherwise subject to KSA extreme sanction—perhaps for having followed Plaintiff or "liked" a posting while believing their identity was "protected."

25.     Now Plaintiff cannot even access the list of over 36,000 pro-democracy leaning followers who have had enough of the KSA's police state antics, perversely turning Twitter's "commitment" on its head by silencing critics of terrorism and violence, and positioning Twitter to continue to carry the KSA's water by doing violence to truth and free speech, and by denying Plaintiff access to his proprietary list of followers, research and other intellectual property, even after Twitter's slip shod adherence to its protocols and negligence in its hiring and supervision of embedded spies was roundly exposed by the Department of Justice's November 2019 Criminal Complaint.[7]

26.     Despite its commitment to "serve the public conversation," Twitter's conduct amounts to silencing Lech Wałęsa to preserve its reach and market share in the USSR. To make matters worse, Twitter did so *after* hiring KGB agents to oversee internal operations.   The ramifications of this kind of willful blindness cannot be overstated.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Violation of the Stored Communications Act, 18 U.S.C. § 2701, et. seq.)

27.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

---

[7] https://www.justice.gov/usao-ndca/press-release/file/1215976/download

28.    In infiltrating and accessing Plaintiff's confidential Twitter information, Alzabarah and Abouammo intentionally exceeded their authorization to access that facility and thereby authorized access to electronic communication while it was in electronic storage.

29.    Plaintiff is informed and believes, and based thereon alleges, that one or more of Twitter's managing agents ratified this conduct by, *inter alia*, concealing from Plaintiff the fact that Alzabarah and Abouammo, while acting as agents for KSA, had wrongly obtained access to this information.

30.    Twitter's Chairman, Jack Dorsey, ratified this conduct by holding a cordial meeting and posing for publicity photographs with MBS seven months after Dorsey learned that KSA had recruited at least two of Twitter's employees to steal the private and confidential information of thousands of Twitter users.

31.    As a direct result of Twitter's violation of 18 U.S.C. § 2701, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.

32.    As a direct result of Twitter's violation of 18 U.S.C. § 2701, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

33.    Twitter's unlawful actions were intentional, willful, and/or were taken in willful disregard of Plaintiff's rights.

34.    In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

35.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

36.    In or about 2009, Mr. Al-Ahmed entered into a contractual relationship with Twitter when he created a Twitter user account.

37.    Both Mr. Al-Ahmed and Twitter agreed to abide by the terms of Twitter's user agreement (the "Contract").

38.    Pursuant to the Contract, Twitter further implicitly agreed to take all necessary measures in order to properly and effectively safeguard Mr. Al-Ahmed's account.

39.    As more fully alleged above, without any justification, in or around 2018, Twitter breached its Contract with Mr. Al-Ahmed by failing to adhere to the procedures and protections set forth in Twitter's policies in ways including, but not limited to, the following:

    a.  Failing to ensure that all necessary measures were being taken in order to properly and effectively safeguard Mr. Al-Ahmed's account and personal information;

    b.  Failing to follow its own procedures;

    c.  Disclosing sensitive confidential information to the KSA in violation of their policies, Federal Law, and the applicable New York regulations;

    d.  Prematurely suspending Mr. Al-Ahmed's Twitter account without any justification;

    e.  Preventing Mr. Al-Ahmed from continuing to use his Twitter account; and

    f.  Failing to adequately or meaningfully address and consider Mr. Al-Ahmed's appeal from the suspension of his account.

40.     Mr. Al-Ahmed has suffered damages as a direct and proximate result of Twitter's breach of the user agreement and Twitter's policies including, but not limited to, the following:

      a.   Long-term injury to his professional reputation and career;

      b.   Loss of compensation and wages; and

      c.   Loss of opportunity of employment, interviews, and events at other institutions.

41.     As a direct and legal result of Twitter's breach of the Contract, Mr. Al-Ahmed has been damaged in an amount to be determined at trial but which is in excess of $75,000.

### THIRD CAUSE OF ACTION

**(Interference with Prospective Economic Advantage)**

42.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

43.     Mr. Al-Ahmed had invested substantial time and effort to develop and maintain his Twitter platform, as well his prospective business partners and relationships.

44.     Mr. Al-Ahmed had a reasonable expectancy of employment and career opportunities he received through Twitter.

45.     Through communications between Twitter and Mr. Al-Ahmed, Twitter knew and understood that Mr. Al-Ahmed used Twitter as a means to network, and secure other employment and career opportunities including, but not limited to, interviews with media companies and news networks, and writing and reporting opportunities.

46.     Twitter interfered with, and suspended Mr. Al-Ahmed's account with the understanding that, doing so would impede his ability to secure gainful employment and career opportunities elsewhere.

47.     As a direct and proximate result of Twitter's interreference, Mr. Al-Ahmed suffered adverse consequences. Mr. Al-Ahmed was further caused to suffer lost past and future wages, professional opportunities and other valuable benefits and emoluments of employment all to his detriment. Twitter's wrongful con duct damages Mr. Al-Ahmed's expected business, proximately resulting in substantial lost revenues and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000.

48.     In committing the foregoing wrongful acts, Defendant acted with malice, oppression, fraud, an intent to injure, and a conscious disregard of Mr. Al-Ahmed's rights, entitling him to punitive damages in amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Tortious Invasion of Privacy – Public Disclosure of Private Facts)

49.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

50.     As described herein, Twitter improperly disclosed confidential and personal information between and concerning, *inter alia*, Mr. Al-Ahmed's private relationships with other Saudi dissidents including the foregoing individuals' email addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses.

51.     The confidentiality of the disclosed information is protected by the Twitter user agreement.

52.     Furthermore, as alleged above, Twitter jeopardized the safety and wellbeing of both Mr. Al-Ahmed and his followers by disclosing said confidential information to the KSA.

53.     The information disclosed concerns the private life, career, and reputation of Mr. Al-Ahmed, as well as that of his followers.

54.    The disclosure of this information would be highly offensive to a reasonable person.

55.    Furthermore, Twitter acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Mr. Al-Ahmed.

56.    Twitter's conduct was outrageous, grossly fraudulent, or reckless toward the reputation of Mr. Al-Ahmed.

57.    Twitter's actions injured Mr. Al-Ahmed in numerous ways, including, but not limited to, the following:

   a.   Long-term injury to Mr. Al-Ahmed's professional reputation and career; and

   b.   Loss of employment at, *inter alia*, news stations and media companies.

58.    As a direct and proximate result of Twitter's interreference, Mr. Al-Ahmed suffered adverse consequences, proximately resulting in substantial lost revenues and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000. Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

59.    In committing the foregoing wrongful acts, Defendant acted with malice, oppression, fraud, an intent to injure, and a conscious disregard of Mr. Al-Ahmed's rights, entitling him to punitive damages in amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Negligence - Negligent Hiring, Training, and Supervision)

60.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

61. Twitter had a duty to use reasonable care to select, train and supervise employees who were competent and fit to perform the duties of a Twitter employee.

62. If the Twitter employees had been properly hired, trained, and supervised, the confidential information regarding Mr. Al-Ahmed and his followers would not have been disclosed.

63. Twitter failed to take reasonable measures to select, train, and supervise their employees to prevent them from gaining access to Mr. Al-Ahmed's account, and disclosing confidential and sensitive information to third parties, including, but not limited to, the KSA. These Defendant may have been otherwise negligent.

64. As a direct and proximate cause of Defendant's negligence, Plaintiff Mr. Al-Ahmed was put in significant danger and lost access to his Twitter account, and its corresponding social and professional networking opportunities, resulting in lost revenues, lost professional and economic opportunities, and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000.

65. Mr. Al-Ahmed has sustained and will continue to sustain permanent impairment of his current and future earning capacity, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

66. In committing the foregoing wrongful acts, Defendant acted with malice, oppression, fraud, an intent to injure, and a conscious disregard of Mr. Al-Ahmed's rights, entitling him to punitive damages in amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, upon all of the facts and circumstances herein alleged, Plaintiffs

respectfully request that this Court:

A. Grant judgment against the Defendant on each and every cause of action as alleged and delineated herein;

B. Grant compensatory damages against the Defendant in the amount to be determined at trial;

C. Grant punitive damages against the Defendant in the amount to be determined at trial;

D. Grant any other damages permitted to be recovered by law pursuant to the above causes of action;

E. Grant an award of reasonable attorney's fees and costs expended in connection with the prosecution of this action pursuant to 42 U.S.C. § 1988; and

F. Grant any such further relief as this Court may deem just, proper, and equitable.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:   Garden City, New York
          June 29, 2020

                                       **GERSTMAN SCHWARTZ, LLP**
                                       By:  */s/ David M. Schwartz*
                                       David M. Schwartz, Esq.
                                       Randy E. Kleinman, Esq.
                                       1399 Franklin Avenue, Suite 200
                                       Garden City, New York 11530
                                       Tel. No.: (516) 880 – 8170
                                       dschwartz@gerstmanschwartz.com
                                       rkleinman@gerstmanschwartz.com
                                       *Attorneys for Plaintiffs*