UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALI AL-AHMED,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br><br>TWITTER, INC.,<br><br><div align="center">Defendant.</div> | **AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 1:20-cv-04982 |

Plaintiff Ali Al-Ahmed (hereinafter, "Plaintiff" or "Mr. Al-Ahmed") by and through his attorneys, Gerstman Schwartz LLP, as and for its Complaint against Defendant Twitter (hereinafter, "Defendant" or "Twitter"), hereby alleges as follows:

<u>**JURISDICTION & VENUE**</u>

1.      Jurisdiction is proper in this court because this litigation arises under federal law, namely 18 U.S.C. §2701 et seq. (Violation of the Stored Communications Act). The Court has jurisdiction over this action under 28 U.S.C. § 1331.

2.      The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367, and 28 U.S.C. § 1362 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c) because Defendant resides in this district insofar as it maintains a sprawling, 12-floor corporate headquarters (its second largest office) located at 245 West 17th Street in Manhattan—a news and media mecca—in deference to New York City as a global media market.

4.      While venue is proper in New York, California law is applicable under New York's "interests analysis" approach insofar as a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in California. *See Belmac Hygiene, Inc. v. Medstar, Inc.*, 121 F.3d 835, 838 (2d. Cir. 1997); *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342 (1991).

## PARTIES

5.      Plaintiff Ali Al-Ahmed is one of the leading political dissidents to the Kingdom of Saudi Arabia (hereinafter "KSA") who resides, and has been granted asylum in, the United States because he faced imminent persecution were he to return to his native country, Saudi Arabia.

6.      Defendant Twitter is a Delaware corporation with its principal place of business located in San Francisco, California and its second largest corporate headquarters located at 245 West 17th Street, New York, New York. Twitter conducts business throughout the United States, including New York.

7.      In 2011, Saudi Prince Alwaleed Bin Talal (hereinafter, "Bin Talal") purchased $300 million worth of stock in Twitter.  In 2015, Bin Talal made an additional investment, owning 5.2% of the company, more than Twitter's founder and CEO.[1]  A January 29, 2018 article in the British newspaper, *The Daily Mail*, reported that after being imprisoned and perhaps tortured by KSA, Bin Talal signed over many of his assets to Crown Prince Mohammed Bin Salman (hereinafter, "MBS").  According to *The Daily Mail*, a deal was allegedly made with MBS allowing MBS to

---

[1] Twitter's April 20, 2016 Annual Proxy Statement, on page 56, confirms that HRH Prince Alwaleed Bin Talel Abudulziz Alsaud beneficially owned 4.99% of the company. A second amendment to a 13G filed with the Securities Exchange Commission on or about December 31, 2016 states that, "based…on the [third quarter 10Q] percentage of class was reduced to 4.9%" This auspicious reduction permitted the Kingdom to avoid future filing and disclosure requirements. A BBC report dated October of 2015 noted that "Prince Alwaleed bin Talal and his investment firm now owns just over 5%, which is more than Twitter's new chief executive Jack Dorsey. His cash injection comes at a critical time for Twitter, which is struggling to attract new followers. Saudi Arabia is said to be home to 40% of all active Twitter users in the Middle East." http://www.bbc.co.uk/newsbeat/article/34474798/meet-twitters-second-biggest-shareholder-saudi-prince-alwaleed-bin-talal.

seize control of these assets and those of other princes, so long as the assets remained in the United States.

8.     Based on news reports indicating that 40% of all active Twitter users in the Middle East resided in the Kingdom and this highly influential stake made in the company Twitter's hiring of Saudi Nationals that turned out to be Saudi agents and its abject failure to properly safeguard Plaintiff's account takes on a new light. Plaintiff's personal and highly sensitive information, including that of his followers was disclosed to third parties including, but not limited to, the KSA and its agents as a result of Defendant recklessness, negligence and at times intentional acts or omissions that appear to have been designed to appease critical investor.

## PRELIMINARY STATEMENT

9.     This is an action to vindicate the rights of Ali Al-Ahmed, a political refugee who has been granted political asylum in the United States from the despotic regime in the Kingdom of Saudi Arabia. Because of the tremendous wealth of key figures in KSA, major corporations, including Twitter, Inc., have enabled, collaborated with, aided and abetted, and turned a blind eye to KSA's efforts to suppress, torture, falsely imprison, terrorize, and murder dissenters both within Saudi Arabia and around the world.

## FACTS

### Facts In Common to All Causes of Action

10.     Mr. Al-Ahmed is a leading voice of dissent casting an evidently unwanted magnifying glass upon the acts and omissions, policies and, at times, alleged crimes conducted on behalf of, or with the knowledge and consent of, the Kingdom of Saudi Arabia ("KSA") or elements within the KSA. Mr. Al-Ahmed is also one of the most active and courageous journalists within the United States covering the KSA.  Through his prominent social media presence, and persistent critique of the KSA, Mr. Al-Ahmed has brought broad awareness to issues of social and

political concern including allegations of KSA human rights violations, KSA links to international terrorism, and KSA corruption within the Kingdom.

11.     It would not be an overstatement to suggest that Mr. Al-Ahmed has become a thorn in the side of the KSA. Indeed, he would not dispute that he has made it his life's work to counter KSA propaganda and expose systemic corruption, violence, and police state tactics within the KSA, and to counter KSA efforts to miscast itself as a modern nation. As a result, Mr. Al-Ahmed attests that the KSA has consistently attempted to—quite literally—silence his voice, even going so far as to attempt to kidnap and kill him on multiple occasions. The KSA has also formally stripped Mr. Al-Ahmed of his Saudi nationality and has kept him under vigilant surveillance.

12.     He has been invited to speak by institutions including Princeton University, Amnesty International, the Hudson Institute, American Enterprise Institute, and Meridian International Center and has testified before Congress on several occasions on the issue of civil rights and religious freedom in the Middle East. He has authored reports on Saudi Arabia regarding religious freedom, torture, press freedom, and religious curriculum.

13.     Although Mr. Al-Ahmed usually disseminates information via social media, Al-Ahmed is a frequent consultant to major international broadcast media on issues including Saudi political affairs, terrorism, Sunni-Shi'a relations, Wahhabi Islam, political and religious oppression, human and women's rights in Saudi Arabia, and the Saudi-U.S. relationship. He has been a regular guest on CBS News, CNN, PBS, Fox News, and Al-Jazeera. He has written for, and has been quoted in, the Washington Post, Associated Press, The Times, Reuters, the Wall Street Journal, USA Today and the Boston Globe. In short, he is a leading Saudi voice for KSA reform and democratization.

14.     With the passage of time, Mr. Al-Ahmed has become such an influential voice that multiple prominent Saudi officials have followed his Arabic Twitter, his largest verifiable social media account, which has over 36,000 followers worldwide (although, as will be described in further detail herein, it has since been suspended).

### Alzabarah's and Abouammo's Unauthorized and Unlawful Access of Mr. Al-Ahmed's Private Information

15.     In or around August 2013, until in or around December 2015, Ali Hamad Alzabarah (hereinafter, "Alzabarah ") and Ahmad Abouammo (hereinafter, "Abouammo"), Twitter employees charged by the United States government with being KSA spies,[2] accessed the company's information on an array of Saudi dissidents including Mr. Al-Ahmed.[3]

16.     Through use of both Alzabarah and Abouammo, the KSA was successful in using Twitter's internal resources to identify Mr. Al-Ahmed as a critic of the government and ultimately silence him.

17.     On numerous occasions, Alzabarah and Abouammo mined Twitter's internal systems for, *inter alia*, personal information regarding Mr. Al-Ahmed, email addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses.

18.     According to the Twitter "Playbook," which outlines the policies Twitter employees must abide by, Alzabarah and Abouammo were prohibited from engaging in outside employment or consulting "or other business activity that would create a conflict of interest with the company." [4] Certainly, acting as spies, foreign agents and purveyors of assignation would be

---

[2] https://www.justice.gov/usao-ndca/press-release/file/1215976/download
*UNITED STATES v. AHMED ALMUTAIRI*, a/k/a AHMED ALJBREEN; and ALI ALZABARAH, November 2019.
[3] SUPERSEDING INDICTMENT dated July 28 2020 19-CR-621 EMC "After ALZABARAH returned to San Francisco, from May 21, 2015,through November 18, 2015, he accessed without authorization through Twitter's computer system certain nonpublic account information of dozens of Twitter users, including accounts that had posted critical or embarrassing information about the government of KSA and Saudi Royal Family Member-1."
[4] https://www.sec.gov/Archives/edgar/data/1418091/000156459017013336/twtr-ex101_6.htm

prohibited. Twitter's Employee Invention Assignment and Confidentiality Agreements with both Alzabarah and Abouammo reinforced "a relationship of confidence and trust" between Twitter and each of them with respect to any information of a confidential nature or secret nature that may be disclosed over the course of their employment with the company. [5]

19.     Neither Alzabarah nor Abouammo's job duties included a need to access Mr. Al-Ahmed's private information.  The fact that they did so was a serious and reportable violation of the Twitter Playbook polices regarding safeguarding user data. A superseding indictment makes clear that Twitter failed to detect these breaches over a period of time spanning over a year.    While Twitter has since ostensibly attempted to remedy their indefensible security practices, the damage to Mr. Al-Ahmed and his followers had already been done. Twitters' subsequent efforts to enhance their security protocols does not undo the damage done to Mr. Al-Ahmed and his followers as a result of Twitter's slip shot practices which have made Mr. Al-Ahmed and many of his followers targets for the brutal KSA, jeopardizing the very lives of his followers living within the confines of the KSA and its surrounding environs.

20.     Indeed, several Twitter users, who either followed Mr. Al-Ahmed's Twitter account and/or had direct contact with him through the use of private messaging, have disappeared, been arrested, or have been executed. One such example is Abdullah al-Hamid, a Saudi Dissident and follower of Mr. Al-Ahmed's Twitter account, who was jailed and ultimately died in custody.[6]

21.     On the heels of all this death and skullduggery, on or about May 2018, the KSA managed to fully silenced Mr. Al-Ahmed when they had their embedded Twitter agents or others within Twitter suspend Mr. Al-Ahmed's Arabic Twitter account, "@AliAlahmed," without

---

[5] *Id*.

[6] https://www.nytimes.com/2020/05/21/world/middleeast/abdullah-al-hamid-saudi-dissident-dies-in-detention-at-69.html

explanation or warning. Despite the above-noted Justice Department criminal complaint exposing these Twitter KSA agents' activities in November of 2019, Mr. Al-Ahmed's repeated attempt to appeal this suspension have been to no avail. While Twitter may wish to play the victim of state-sponsored espionage Twitters punishing of the victims of these intrigue including Mr. Al_Ahmed tells a far different story. One of ratification or complicity or adoption tailored to appease a neigh beneficial owner or preserve access to a key market – the KSA.[7]

22.     This helps explain why Twitter has upheld this suspension and kept his account inaccessible including Mr. Al-Ahmed's access to his approximately *36,000 followers' contact information*. The genesis of this suspension having been clearly exposed, Twitter continues to bar Mr. Al-Ahmed from access or use lending credence to claims that Twitter is continuing to do the bidding of the KSA; preferring access to the Kingdom and funding from the Kingdom over human rights, freedom and to abiding by the terms of its owner agreements made with Twitter subscribers, and in contravention of its public representation that Twitter is committed to protecting Twitter uses.[8]

23.     Mr. Al-Ahmed spent many years of time and effort cultivating, developing and curating his expansive list of Twitter followers, which effectively amounted to valuable intellectual

---

[7] Authorities have evidently failed to recognize how beholden Twitter is to the KSA, particularly during the timeframe in question, which supports an allegation of willful blindness and complicity. Additionally, by punishing the victim of this conduct, by continuing to withhold the above-referenced followers' contacts of a known critic of the KSA, Twitter has ratified the actions of its supposedly errant employees and shown its continuing allegiance to the KSA. *C.R. v Tenet Healthcare Corp*., 169 Cal. App. 4th 1094 (2009), informs us that "an employer may be liable for the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort." Discovery may well establish that Twitter had to have known about this espionage. At the least, its course of conduct since—notwithstanding its assertions of federal cooperation—amounts to ratification because Twitter continues to punish the KSA's enemies by withholding their followers' contact information and banning them from the platform.
[8] https://help.Twitter.com/en/safety-and-security/public-and-protected-tweets "About public and protected Tweets – Should you choose to protect your Tweets, you can do so through your account settings…If you protect your Tweets, you'll receive a request when new people want to follow you, which you can approve or deny…Protected Tweets: Only visible to your Twitter followers. Please keep in mind, your followers may still capture images of your Tweets and share them." Twitter thus created an illusion of security and safety relied upon by Plaintiff, and, according to Plaintiff, by those who were "disappeared," arrested or eliminated.

and proprietary property—particularly insofar as it earned him credibility, career nods and income—reflecting a huge number of persons interested in unvarnished coverage of KSA activities provided from a pro-democracy and pro-human rights vantage point.  Upon information and belief, some of Mr. Al-Ahmed's followers' accounts have also been shut down as a result of protesting his account suspension. This is not only immoral, it is undemocratic.

In pertinent part, Twitter, in its "Twitter Rules," states that,

> Twitter's purpose is to serve the public conversation. Violence, harassment and other similar types of behavior discourage people from expressing themselves, and ultimately diminish the value of global public conversation. Our rules are to ensure all people can participate in the public conversation freely and safely…Safety - Violence: You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence. Learn more about our violent threat and glorification of violence policies…

> Terrorism/violent extremism: You may not threaten or promote terrorism or violent extremism. There is no place on Twitter for terrorist organizations or violent extremist groups and individuals who affiliate with and promote their illicit activities. The violence that these groups engage in and/or promote jeopardizes the physical safety and well-being of those targeted. Our assessments in this context are informed by national and international terrorism designations. We also assess organizations under our violent extremist group criteria. Violent extremist groups are those that meet all of the below criteria: identify through their stated purpose, publications, or actions as an extremist group; have engaged in, or currently engage in, violence and/or the promotion of violence as a means to further their cause; and target civilians in their acts and/or promotion of violence. We examine a group's activities both on and off Twitter to determine whether they engage in and/or promote violence against civilians to advance a political, religious and/or social cause.

> What is in violation of this policy? Under this policy, you can't affiliate with and promote the illicit activities of a terrorist organization or violent extremist group. Examples of the types of content that violate this policy include, but are not limited to: engaging in or promoting acts on behalf of a terrorist organization or violent extremist group; recruiting for a terrorist organization or

violent extremist group; providing or distributing services (e.g., financial, media/propaganda) to further a terrorist organization's or violent extremist group's stated goals; and using the insignia or symbols of terrorist organizations or violent extremist groups to promote them. What is not a violation of this policy? We may make limited exceptions for groups that have reformed or are currently engaging in a peaceful resolution process, as well as groups with representatives who have been elected to public office through democratic elections. We may also make exceptions related to the discussion of terrorism or extremism for clearly educational or documentary purposes. This policy also doesn't apply to military or government entities.[9]

24.     Between Twitter's holding out that one can protect their Tweets, the above-referenced affirmative corporate and global commitment to "serve the public conversation," and Twitter's supposed opposition to violence and terrorism, Twitter's failure to screen and supervise its employees, thereby allowing KSA spies to embed in Twitter, makes a mockery of this so-called "commitment." It is a crying shame that individuals like the Plaintiff have detrimentally relied on same to their undying personal prejudice, particularly in the face of those who how have been "disappeared," arrested or otherwise subject to KSA extreme prejudice or sanction—perhaps for having followed Plaintiff or "liked" a posting while believing their identity was "protected."

25.     Now Plaintiff cannot even access the list of over 36,000 pro-democracy leaning followers who have had enough of the KSA's police state antics, perversely turning Twitter's "commitment" on its head by silencing critics of terrorism and violence, and positioning Twitter to continue to carry the KSA's water by doing violence to truth and free speech, and by denying Plaintiff access to his proprietary list of followers, research and other intellectual property, even after Twitter's slip shod adherence to its protocols and negligence in its hiring and supervision of

---

[9] https://help.twitter.com/en/rules-and-policies/twitter-rules

embedded spies was roundly exposed by the Department of Justice's November 2019 Criminal Complaint.[10]

26.     Despite its commitment to "serve the public conversation," Twitter's conduct is equivalent to silencing Lech Wałęsa to preserve its reach, market share and funding from the USSR. To make matters worse, Twitter did so *after* hiring KGB agents (actually KSA agents and recruits) to oversee internal operations.  The ramifications of this kind of continuing and willful blindness cannot be overstated.

27.     In Twitter's June 30, 2020 10Q filed with the U.S. S.E.C. on or about August 3, 2020, Twitter "disclosed that on July 28, 2020, the Company received a draft complaint from the Federal Trade Commission (FTC) alleging violations…[r]elate[d] to the Company's use of phone number and/or email address data provided for safety and security purposes [ostensibly for targeted advertising] during periods between 2013 and 2019 [and reserving for]…probable loss in this matter is $150.0 million to $250.0 million."[11] This may or may not relate directly to the claims herein but Twitter clearly has not safeguarded data as promised and expected and has to be held accountable for the way it conducts business.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Violation of the Stored Communications Act, 18 U.S.C. § 2701, et. seq.) and Respondeat superior

28.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

---

[10] https://www.justice.gov/usao-ndca/press-release/file/1215976/download
[11] 10Q dated June 30, 2020, https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000141809120000158/twtr-20200630.htm

29.     In infiltrating and accessing Plaintiff's confidential Twitter information, Alzabarah and Abouammo accessed that facility and thereby authorized access to electronic communication while it was in electronic storage without Plaintiff's permission and contrary to Plaintiff's expectations.

30.     Plaintiff is informed and believes, and based thereon alleges, that one or more of Twitter's managing agents adopted, ratified or was complicit in this conduct by, *inter alia*, concealing from Plaintiff the fact that Alzabarah and Abouammo, while acting as agents for KSA, had wrongly obtained access to this information.

31.     Twitter's Chairman, Jack Dorsey, ratified, adopted or was complicit in this conduct by holding a cordial meeting and posing for publicity photographs with MBS seven months after Dorsey learned that KSA had recruited at least two of Twitter's employees to steal the private and confidential information of thousands of Twitter users and then continuing to hold hostage the Twitter contacts of a democracy advocate like Plaintiff, thereby making Twitter's alignment with the KSA abundantly clear; notwithstanding all the policies and playbook pronouncements that their users had relied upon.

32.     As a direct result of Twitter's violation of 18 U.S.C. § 2701, Plaintiff has suffered loss of property and has incurred out-of-pocket expenses in excess of $75,000.

33.     As a direct result of Twitter's violation of 18 U.S.C. § 2701, Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

34.     Twitter's unlawful actions were intentional, willful, and/or were taken in willful disregard of Plaintiff's rights to appease a neigh beneficial holder and preserve market share in the KSA.

35.     In addition to general and economic damages, Plaintiff seeks punitive damages in an amount sufficient to punish Twitter and to protect future Twitter users from Defendant's wrongful practices described herein.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

36.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

37.     In or about 2009, Mr. Al-Ahmed entered into a contractual relationship with Twitter when he created a Twitter user account.

38.     Both Mr. Al-Ahmed and Twitter agreed to abide by the terms of Twitter's user agreement (the "Contract").

39.     Pursuant to the Contract, Twitter further implicitly agreed to take all necessary measures in order to properly and effectively safeguard Mr. Al-Ahmed's account.

40.     As more fully alleged above, without any justification, in or around 2014 through 2018, Twitter breached its Contract with Mr. Al-Ahmed by failing to adhere to the procedures and protections set forth in Twitter's policies in ways including, but not limited to, the following:

a.   Failing to ensure that all necessary measures were being taken in order to properly and effectively safeguard Mr. Al-Ahmed's account and personal information;

b.   Failing to follow its own procedures;

c.   Disclosing sensitive confidential information to the KSA in violation of their policies, Federal Law, and the applicable New York regulations;

    d.   Prematurely suspending Mr. Al-Ahmed's Twitter account without any justification;

    e.   Preventing Mr. Al-Ahmed from continuing to use his Twitter account; and

    f.   Failing to adequately or meaningfully address and consider Mr. Al-Ahmed's appeal from the suspension of his account.

41.    Mr. Al-Ahmed has suffered damages as a direct and proximate result of Twitter's breach of the user agreement and Twitter's policies including, but not limited to, the following:

    a.   Long-term injury to his professional reputation and career;

    b.   Loss of compensation and wages; and

    c.   Loss of opportunity of employment, interviews, and events at other institutions.

42.    As a direct and legal result of Twitter's breach of the Contract, Mr. Al-Ahmed has been damaged in an amount to be determined at trial but which is in excess of $75,000.

### THIRD CAUSE OF ACTION

### (Interference with Prospective Economic Advantage)

43.    Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44.    Mr. Al-Ahmed had invested substantial time and effort to develop and maintain his Twitter platform, as well his prospective business partners and relationships.

45.    Mr. Al-Ahmed had a reasonable expectancy of employment and career opportunities he received through Twitter.

46.    Through communications between Twitter and Mr. Al-Ahmed, Twitter knew and understood that Mr. Al-Ahmed used Twitter as a means to network, and secure other employment

and career opportunities including, but not limited to, interviews with media companies and news networks, and writing and reporting opportunities.

47.     Twitter interfered with, and suspended Mr. Al-Ahmed's account with the understanding that, doing so would impede his ability to secure gainful employment and career opportunities elsewhere.

48.     As a direct and proximate result of Twitter's interference, Mr. Al-Ahmed suffered adverse consequences. Mr. Al-Ahmed was further caused to suffer lost past and future wages, professional opportunities and other valuable benefits and emoluments of employment all to his detriment. Twitter's wrongful con duct damages Mr. Al-Ahmed's expected business, proximately resulting in substantial lost revenues and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000.

49.     In committing the foregoing wrongful acts, Defendant acted with malice, oppression, fraud, an intent to injure, and a conscious disregard of Mr. Al-Ahmed's rights, entitling him to punitive damages in amount to be determined at trial.

### FOURTH CAUSE OF ACTION

**(Tortious Invasion of Privacy – Public Disclosure of Private Facts)**

50.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

51.     As described herein, Twitter through its employees actions improperly disclosed confidential and personal information between and concerning, *inter alia*, Mr. Al-Ahmed's private relationships with other Saudi dissidents including the foregoing individuals' email addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses.

52.     The confidentiality of the disclosed information is protected by the Twitter user agreement.

53.     Furthermore, as alleged above, Twitter jeopardized the safety and wellbeing of both Mr. Al-Ahmed and his followers by disclosing said confidential information to the KSA.

54.     The information disclosed concerns the private life, career, and reputation of Mr. Al-Ahmed, as well as that of his followers.

55.     The disclosure of private information would be highly offensive to a reasonable person when it is understood that such information could be used by a foreign government to punish or remove opposition and silence criticism which was clearly foreseeable.

56.     Furthermore, Twitter acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Mr. Al-Ahmed.

57.     Twitter's conduct was outrageous, grossly fraudulent, or reckless toward the reputation of Mr. Al-Ahmed.

58.     Twitter's actions injured Mr. Al-Ahmed in numerous ways, including, but not limited to, the following:

a.   Long-term injury to Mr. Al-Ahmed's professional reputation and career; and

b.   Loss of employment at, *inter alia*, news stations and media companies.

59.     As a direct and proximate result of Twitter's interference, Mr. Al-Ahmed suffered adverse consequences, proximately resulting in substantial lost revenues and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000. Plaintiff has also suffered stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional

reputation and the anguish of knowing his life's work was imperiled along with the very lives of those who followed his Twitter postings.

60.     In committing the foregoing wrongful acts, Defendant acted with malice, oppression, fraud, an intent to injure, and a conscious disregard of Mr. Al-Ahmed's rights, entitling him to punitive damages in amount to be determined at trial.

### FIFTH CAUSE OF ACTION

**(Negligence - Negligent Hiring, Training, and Supervision)**

61.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

62.     Twitter had a duty to use reasonable care to select, train and supervise employees who were competent and fit to perform the duties of a Twitter employee.

63.     If the Twitter employees had been properly hired, trained, and supervised, the confidential information regarding Mr. Al-Ahmed and his followers would not have been disclosed.

64.     Twitter failed to take reasonable measures to select, train, and supervise their employees to prevent them from gaining access to Mr. Al-Ahmed's account, and disclosing confidential and sensitive information to third parties, including, but not limited to, the KSA. These Defendant may have been otherwise negligent.

65.     As a direct and proximate cause of Defendant's negligence, Plaintiff Mr. Al-Ahmed was put in significant danger and lost access to his Twitter account, and its corresponding social and professional networking opportunities, resulting in lost revenues, lost professional and economic opportunities, and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000.

66.     Mr. Al-Ahmed has sustained and will continue to sustain permanent impairment of his current and future earning capacity, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

67.     In committing the foregoing negligent acts or omissions Defendant acted with a negligent disregard of Mr. Al-Ahmed's rights, entitling him to damages in amount to be determined at trial. Defendant's liability under *the doctrine of respondeat superior* imposes liability upon Defendant for the acts and omissions of its employees and agents.

## SIXTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

68.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

69.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the agents and/or employees of Defendant were at all times acting within the purpose and scope of such agency and employment.

70.     California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

71.     As a result of the actions of Defendant as set forth herein, said Defendant has violated the implied covenant of good faith and fair dealing contained in the agreements between the parties as against Plaintiff herein, and as a result thereof, Plaintiff is entitled to damages as alleged.

72.     The actions of Defendant, in as hereinbefore described including, but not limited to, disclosing confidential and sensitive information to third parties including, but not limited to,

the KSA, and subsequent censoring Plaintiff on behalf of the KSA, places Defendant in violation of said implied covenant of good faith and fair dealing having caused the Plaintiff to suffer damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Reckless Endangerment)

73.     Plaintiff hereby incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

74.     Twitter had a duty to use reasonable care to select, train and supervise employees who were competent and fit to perform the duties of a Twitter employee as well as to protect the confidential biographical data of its user/s.

75.     Twitter deliberately disregarded the high probability that an injury would occur and made a conscious choice of a deliberate course of action that Twitter had to know involved serious danger to others when Twitter failed to take reasonable measures to select, train, and supervise their employees to prevent these employees from gaining access to Mr. Al-Ahmed's account, and disclosed confidential and sensitive information to third parties including, but not limited to, the KSA or its agents.

76.     As a direct and proximate cause of Defendant's recklessness, Plaintiff Mr. Al-Ahmed was put in significant danger and lost access to his Twitter account and its corresponding social and professional networking opportunities, resulting in lost revenues, lost professional and economic opportunities, and other damages to Mr. Al-Ahmed, in an amount to be determined according to proof at trial but which is in excess of $75,000.

77.     Mr. Al-Ahmed has sustained and will continue to sustain permanent impairment of his current and future earning capacity, stress, anxiety, emotional distress, pain and suffering,

inconvenience, mental anguish, loss of enjoyment, and damage to his personal and professional reputation.

78.     In committing the foregoing wrongful acts, Defendant acted with a conscious disregard of Mr. Al-Ahmed's rights amounting to a level of conscious choice of a course of action with knowledge of the serious danger to others involved in it, thus entitling him to punitive damages in amount to be determined at trial.[12]

## **EIGHT CAUSE OF ACTION**

### **(Fraudulent Inducement)**

79.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

80.     As alleged above, Defendant made fraudulent and false statements of material fact, and omitted material facts necessary in order to make its statements, in light of the circumstances under which they were made, not misleading.

81.     Defendant induced Plaintiff into using its social media platform after signing and/or agreeing to Defendant'ss Contract, which is/was predicated on false and material misrepresentations that Defendant would maintain a secure and safe platform conducive to the free exchange of ideas.

82.     Yet Defendant knew or should have known there was an inherent conflict between maintaining such a platform and their beneficial ownership by the KSA and desire to retain market share in the KSA; a closed and undemocratic society known to impose extreme sanctions upon dissenters.

---

[12] *See* Judicial Council of California Civil Jury Instructions, page 348 (2017 edition) - CACI No. 3113. "Recklessness" Explained

83.     Defendant made these materially misleading statements and omissions for the purpose of inducing Plaintiff to utilize its platform, thereby ensnaring Plaintiff's extended list of followers in a worldwide web of danger. Adding insult to injury, Defendant—after being exposed for employing KSA agents—continued to censor Plaintiff, blocking him from accessing to his own follower's list, thus punishing the victim.

84.     Defendant had a legal duty separate from the duty to perform under the Contract, which included a reasonable expectation to safeguard Plaintiff's, and other third parties', personal information, and Defendant's actions demonstrate a fraudulent misrepresentation collateral to the Contract nonetheless relied upon. Plaintiff therefore seeks special damages that are caused by this misrepresentation and otherwise unrecoverable as Contract damages alone.

85.     Plaintiff justifiably, reasonably, and foreseeably relied on Defendant's ongoing assurances that the Twitter social media platform would be regulated in a fair, even-handed, and safe manner that is consonant with reasonable expectations.

86.     Absent Defendant's misrepresentations and false statements, Plaintiff would not have agreed to sign up to use Defendant's platform.

87.     As a result of the false and misleading statements and omissions, as alleged herein, Plaintiff has been damaged in an amount to be determined at trial, but believed not to be less than $1,000,000, in addition to the punitive damages necessary to sanction Defendant for its deceit, which has imperiled or cost the lives of platform users.

## **NINTH CAUSE OF ACTION**

### **(Violation of Free Speech Unprotected by Section 230 of the Communications Decency Act of 1996)**

88.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

89.     While it remains axiomatic that the 47 U.S.C. § 230 (the "Communications Decency Act" or "CDA") generally shields social media outlets from complaints of censorship, s*ee*, *e.g.*, Zeran v. America Online Inc., 129 F.3d 327, 330 (4th Cir. 1997) (emphasis supplied) ("lawsuits seeking to hold a service provider liable for its exercise of a publisher's *traditional editorial functions* -- such as deciding whether to publish, withdraw, postpone or alter content -- are barred), what Plaintiff alleges here is a far cry from "*traditional editorial functions*." *Id*.

90.     To this end, Defendant has failed to conduct itself as a traditional publisher. Instead, Defendant has trampled on the liberty interests of an American citizen—who, incidentally, is a former Saudi national[13]—and has censored and exposed his followers, acting on behalf of a governmental actor, albeit a foreign one. Such actions should not be protected by the CDA (*see Knight First Amendment Institute at Columbia Univ., et al. v. Donald J. Trump, et al.*, 928 F.3d 226 (2d Cir. 2019). To find otherwise would be to invite an insidious and nonsensical result: one that would encourage and shield foreign governmental intrigue and intervention under the auspices of the CDA while disallowing similar conduct when perpetrated by a duly elected American office holder.

91.     It cannot be ignored that the KSA, through members of the house of Saud, are now, or were, beneficial owners of Twitter, at one time with a higher stake in the company than Twitter's founder, Jack Dorsey. Since then, after some palace intrigue in which the leadership of the KSA was reorganized, KSA spies were inserted into positions of consequence at Twitter.

92.     As a result, personal and highly sensitive information was disclosed to third parties including, but not limited to, the KSA and its agents. For all intents and purposes, given this course

---

[13] In or around 2009, Mr. Ahmed's entire Saudi Arabian record/identity, including his national identification number, were erased from Saudi records. Thus, for all intents and purposes, in the eyes of the KSA, Mr. Ahmed does not—and never did—exist.

of conduct, which includes censoring or suborning censorship of enemies of the Kingdom and/or disclosing confidential information to the KSA or KSA agents, Twitter may be in violation of the Foreign Agents Registration Act, which requires certain agents of foreign principals who are engaged in certain political activities specified under the statute to register with the Federal government.

93.    In any case, while no private right of action exists under FARA, the singling out of Plaintiff and his followers, against the backdrop of hiring KSA spies, and selling beneficial interests in Twitter to the Kingdom, cannot be squared with the exercise of a publisher's traditional editorial functions. Censoring a decrier of KSA human rights violations and decrier of KSA links to terror does not look or feel like traditional editorial activities or functions, at least in these United States.

94.    The KSA and/or the KSA Royal family are and/or were beneficial owners of Twitter and KSA has already compromised Twitter lists, endangering users or worse. Thus, Twitter, under these narrow circumstances, should not be permitted to hide behind the CDA shield as such was never intended to protect this kind of activity.

95.    Defendant's conduct, in as hereinbefore described, including, but not limited to, disclosing confidential and sensitive information to third parties including, but not limited to, the KSA and subsequently censoring Plaintiff on behalf of the KSA constitutes violations of Plaintiff's rights to free speech and assembly unprotected by the CDA. Defendant has thereby caused the Plaintiff to suffer damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, upon all of the facts and circumstances herein alleged, Plaintiffs respectfully request that this Court:

A.  Grant judgment against the Defendant on each and every cause of action as alleged and delineated herein;

B.  Grant compensatory damages against the Defendant in the amount to be determined at trial;

C.  Grant punitive damages against the Defendant in the amount to be determined at trial;

D.  Grant any other damages permitted to be recovered by law pursuant to the above causes of action;

E.  Grant an award of reasonable attorney's fees and costs expended in connection with the prosecution of this action pursuant to 42 U.S.C. § 1988; and

F.  Grant any such further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:   Garden City, New York
         August 5, 2020

**GERSTMAN SCHWARTZ, LLP**
By:  */s/ David M. Schwartz*
      David M. Schwartz, Esq.
      Randy E. Kleinman, Esq.
      1399 Franklin Avenue, Suite 200
      Garden City, New York 11530
      Tel. No.: (516) 880 – 8170
      dschwartz@gerstmanschwartz.com
      rkleinman@gerstmanschwartz.com
      *Attorneys for Plaintiffs*