**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALI AL-AHMED,

                       Plaintiff,

      v.

TWITTER, INC.,

                       Defendant.

Case No. 1:20-cv-04982-VEC

---

## DEFENDANT TWITTER, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT, OR ALTERNATIVELY, TO TRANSFER VENUE

Benjamin Berkowitz
Khari J. Tillery
Anjali Srinivasan
Rylee Kercher Olm
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

Alice K. Jump
REAVIS PAGE JUMP LLP
41 Madison Avenue
41st Floor
New York, NY 10010
Telephone:  212-763-4100
Facsimile:   212-763-4141

1391737

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................3

      A.     Al-Ahmed is a well-known and public critic of the KSA and, as a result of his public criticism, was the subject of harassment by the KSA. ...........................3

      B.     In 2014, the KSA recruited Abouammo and Alzabarah to gain access to Twitter account information. ...................................................................4

      C.     Twitter informed individuals whose accounts may have been compromised...................................................................................5

      D.     Al-Ahmed did not personally suffer personal harm as a result of the KSA's espionage at Twitter. ...........................................................6

      E.     Al-Ahmed's Arabic-language Twitter account was suspended in May 2018..................................................................................6

III.     THE FAC SHOULD BE DISMISSED IN ITS ENTIRETY ...............................6

      A.     The FAC fails to establish personal jurisdiction over Twitter. ...............6

          1.     Twitter is not subject to general jurisdiction in New York.......................7

          2.     Twitter is not subject to specific jurisdiction in New York. .......................7

      B.     Al-Ahmed fails to establish Article III standing to pursue claims against Twitter related to the alleged 2014-2015 KSA espionage. .....................8

      C.     Most of Al-Ahmed's causes of action should be dismissed as time-barred. .........10

          1.     Al-Ahmed was notified of the unauthorized intrusion of his Twitter account more than four-and-a-half years before filing suit. ......................11

          2.     Al-Ahmed waited more than two years after his account suspension before initiating this action.......................................................12

      D.     Twitter is not vicariously liable for the KSA's conduct. .......................12

      E.     CDA Section 230(c)(1) bars Al-Ahmed's account suspension-related claims. ..............................................................................15

      F.     Al-Ahmed cannot state a Free Speech claim against Twitter. ...............17

G.   Al-Ahmed's fraudulent inducement claim fails to satisfy Rule 9(b)'s heightened pleading requirement. .........................................................................18

H.   Al-Ahmed fails to state a claim that Twitter violated his privacy. .......................20

I.   Al-Ahmed fails to plead facts necessary to support his negligent hiring and reckless endangerment claims...................................................................................22

J.   Twitter's Terms of Service bars many of Al-Ahmed's claims. ............................23

IV.   ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA ...................................................................24

V.   CONCLUSION..........................................................................................................25

1391737

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abdulaziz v. Twitter, Inc., et al.*,
  Case No. 3:19-cv-06694-LB (N.D. Cal.), ECF No. 76...................................................... *passim*

*Am. Freedom Defense Initiative v. Lynch*,
  217 F. Supp. 3d 100 (D.D.C. 2016) ...................................................................................16

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
  571 U.S. 49 (2013)..............................................................................................................25

*Bass v. Facebook, Inc.*,
  394 F. Supp. 3d 1024 (N.D. Cal. 2019) ..............................................................................24

*Bennett v. Google, LLC*,
  882 F.3d 1163 (D.C. Cir. 2018) ..........................................................................................16

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)..................................................................................................7

*BNSF Ry. Co. v. Tyrrell*,
  137 S. Ct. 1549 (2017)......................................................................................................1, 7

*Bristol-Myers Squibb Co. v. Super. Ct.*,
  137 S. Ct. 1773 (2017).........................................................................................................7

*Brittain v. Twitter, Inc.*,
  No. 19-CV-00114-YGR, 2019 WL 2423375 (N.D. Cal. June 10, 2019) ...............................16

*Brittain v. Twitter Inc.*,
  No. CV-18-01714-PHX-DGC, 2019 WL 110967 (D. Ariz. Jan. 4, 2019) ............................25

*Brookins v. Rafferty*,
  59 F. App'x 983 (9th Cir. 2003) ..........................................................................................22

*Brown v. Showtime Networks, Inc.*,
  394 F. Supp. 3d 418 (S.D.N.Y. 2019)....................................................................................7

*Cahen v. Toyota Motor Corp.*,
  147 F. Supp. 3d 955 (N.D. Cal. 2015) .................................................................................20

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991)............................................................................................................25

*Chevron Corp. v. Donziger*,
No. 12-MC-80237 CRB (NC), 2013 WL 4536808 (N.D. Cal. Aug. 22, 2013) ....................21

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ...........................................................................................................7

*Darnaa, LLC v. Google LLC*,
756 F. App'x 674 (9th Cir. 2018) ....................................................................................23

*DiStefano v. Carozzi N. Am., Inc.*,
286 F.3d 81 (2d Cir. 2001) .................................................................................................6

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*,
928 F. Supp. 2d 735 (S.D.N.Y. 2013) .............................................................................24

*Express Cos., Inc. v. Lifeguard Med. Sols., LLC*,
No. 10CV178-WQH-WMC, 2010 WL 11508847 (S.D. Cal. Sept. 1, 2010) .........................18

*Fair Hous. Council v. Roommates.com*,
521 F.3d 1157 (9th Cir. 2008) .........................................................................................16

*Fed. Trade Comm'n v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016) ......................................................................................15, 16

*Fehl v. Manhattan Ins. Grp.*,
No. 11-CV-02688-LHK, 2012 WL 10047 (N.D. Cal. Jan. 2, 2012) ......................................11

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 936 (May 18, 2020) ..................15, 16

*Gabelli v. S.E.C.*,
568 U.S. 442 (2013) .........................................................................................................10

*Gitlow v. New York*,
268 U.S. 652 (1925) .........................................................................................................18

*In re Google Location History Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ............................................................................20

*Hartline v. Nat'l Univ.*,
No. 2:14-CV-0635 KJM AC (PS), 2015 WL 4716491 (E.D. Cal. Aug. 7,
2015), *report and recommendation adopted*, No. 2:14-CV-0635 KJM AC
(PS), 2016 WL 426643 (E.D. Cal. Feb. 4, 2016) ...........................................................11, 22

*Kaldis v. Wells Fargo Bank, N.A.*,
263 F. Supp. 3d 856 (C.D. Cal. 2017) ..............................................................................11

iv

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ...........................................................................15

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)...........................................................................10, 11

*Lopez v. Shopify, Inc.*,
   No. 16 Civ. 9761 (VEC) (AJP), 2017 WL 2229868 (S.D.N.Y. May 23, 2017)......................7

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) ...............................................................21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................8, 9

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019).................................................................................17

*McColgan v. Mut. of Omaha Ins. Co.*,
   4 F. Supp. 3d 1228 (E.D. Cal. 2014)...................................................................18

*Mezey v. Twitter, Inc.*,
   No. 1:18-CV-21069-KMM, 2018 WL 5306769 (S.D. Fla. July 19, 2018) ...........................17

*Miller v. Facebook*,
   No. 1:09-CV-2810-RLV, 2010 WL 9525523 (N.D. Ga. Jan. 15, 2010) ..............................25

*Minkler v. Apple, Inc.*,
   65 F. Supp. 3d 810 (N.D. Cal. 2014) ..................................................................18

*Parker Madison Partners v. Airbnb, Inc.*,
   283 F. Supp. 3d 174 (S.D.N.Y. 2017)..................................................................10

*Perez v. Gen. Motors LLC*,
   No. 3:19-CV-00038-L-NLS, 2019 WL 3766613 (S.D. Cal. Aug. 9, 2019) ...........................11

*Pettenato v. Beacon Health Options, Inc.*,
   425 F. Supp. 3d 264 (S.D.N.Y. 2019).................................................................7

*Quan v. Smithkline Beecham Corp.*,
   149 F. App'x 668 (9th Cir. 2005) ....................................................................11

*Ramos v. Los Rios Community College District*,
   No. CV 2:17-1458 WBS KJN, 2018 WL 626381 (E.D. Cal. Jan. 29, 2018) .........................13

*Razuki v. Caliber Home Loans, Inc.*,
   No. 17-cv-1718LAB(WVG), 2018 WL 2761818 (S.D. Cal. June 8, 2018) ...........................22

v

*Ruiz v. Gap, Inc.*,
    540 F. Supp. 2d 1121 (N.D. Cal. 2008) ........................................................21, 22

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016), *as revised* (May 24, 2016)............................................8, 9

*United States v. Abouammo, et al.*,
    Case No. 3:19-cr-000621-EMC (N.D. Cal.), ECF No. 1 ....................................4, 5

*United States v. Abouammo, et al.*,
    Case No. 3:19-cr-000621-EMC (N.D. Cal.), ECF No. 53............................. *passim*

*Wasson v. Sonoma Cty. Jr. Coll. Dist.*,
    4 F. Supp. 2d 893 (N.D. Cal. 1997) ......................................................................21

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196 (2d Cir. 2001)....................................................................................6

*Wilson v. Twitter*,
    No. 3:20-CV-00054, 2020 WL 3410349 (S.D. W. Va. May 1, 2020), *report
    and recommendation adopted*, No. CV 3:20-0054, 2020 WL 3256820 (S.D.
    W.Va. June 16, 2020) ...........................................................................15, 16, 17

*In re Yahoo Mail Litig.*,
    7 F. Supp. 3d 1016 (N.D. Cal. 2014) ....................................................................20

## State Cases

*C.R. v. Tenet Healthcare Corp.*,
    169 Cal. App. 4th 1094 (2009) ........................................................................12, 13

*Delfino v. Agilent Technologies, Inc.*,
    145 Cal. App. 4th 790 (2006) ................................................................................13

*Doe v. Capital Cities*,
    50 Cal. App. 4th 1038 (1996) ................................................................................22

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
    209 Cal. App. 4th 1118 (2012) ..............................................................................23

*Hill v. Nat'l Collegiate Athletic Ass'n*,
    7 Cal. 4th 1 (1994) ................................................................................................20

*Juarez v. Boy Scouts of Am., Inc.*,
    81 Cal. App. 4th 377 (2000) ..................................................................................22

*Lewis v. YouTube, LLC*,
    244 Cal. App. 4th 118 (2015) ..........................................................................23, 24

1391737

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
  12 Cal. 4th 291 (1995) ...............................................................................14

*Loder v. City of Glendale*,
  14 Cal. 4th 846 (1997) ...............................................................................20

*Murillo v. Rite Stuff Foods, Inc.*,
  65 Cal. App. 4th 833 (1998) .......................................................................13

*People v. Stipo*,
  195 Cal. App. 4th 664 (2011) .....................................................................21

*Tu-Vu Drive-In Corp. v. Davies*,
  66 Cal.2d 435 (1967) ..................................................................................12

**Federal Statutes**

18 U.S.C. § 2707(f) .........................................................................................11

28 U.S.C. § 1404(a) ........................................................................................25

47 U.S.C. § 230 ..........................................................................2, 15, 16, 17

**State Statutes**

Cal. Civ. Code § 1668 .....................................................................................23

Cal. Civ. Proc. Code § 335.1 ..........................................................................11

Cal. Civ. Proc. Code § 337(a) .........................................................................11

Cal. Civ. Proc. Code § 338(d) .........................................................................11

Cal. Civ. Proc. Code § 339(1) .........................................................................12

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................18

Fed. R. Civ. P. 12(b)(1) ...................................................................................8

Fed. R. Civ. P. 12(b)(2) ...................................................................................8

N.Y. CPLR § 301 .............................................................................................7

N.Y. CPLR § 302 .............................................................................................7

**<u>Constitutional Provisions</u>**

U.S. Const. Amendment I ....................................................................................................18

**<u>Other Authorities</u>**

Restatement (Second) of Torts § 500 (1965) ..........................................................................23

1391737

## I.   INTRODUCTION[1]

This Court lacks personal jurisdiction over Defendant Twitter, Inc.  There is no general jurisdiction because Twitter is neither incorporated in nor maintains its principal place of business in New York.  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).  There also is no specific jurisdiction because, as Plaintiff Al-Ahmed admits in his First Amended Complaint ("FAC"), "a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in California"—where Twitter is headquartered—not in New York.  FAC ¶ 4.  The FAC should therefore be dismissed for lack of personal jurisdiction.

The FAC should also be dismissed on its merits.  Al-Ahmed's claims against Twitter are based on two alleged events: (1) the 2014 and 2015 intrusion of Twitter accounts carried out by the Kingdom of Saudi Arabia ("KSA"), which exposed certain of Al-Ahmed's Twitter account information; and (2) the 2018 suspension of Al-Ahmed's Arabic-language Twitter account (although his English-language Twitter account remains active).  The FAC is animated by the implausible theory that Twitter—a publicly traded company founded and based in the United States—is liable for these wrongs because it operates under the control of the KSA.  But this wild speculation is contradicted by the facts alleged in the FAC itself.

In 2014 and 2015, Twitter and certain individuals who use its service were victims of state-sponsored espionage carried out by the KSA.  The KSA allegedly targeted and recruited two Twitter employees, Ali Alzabarah and Ahmad Abouammo, to access Twitter accounts on its behalf without the knowledge or authorization of Twitter or the accountholders.  In December 2015, upon learning that its employees may have been compromised by a foreign government, Twitter took steps to protect its accountholders, including terminating Alzabarah's access to Twitter's computer systems, seizing his laptop, and physically escorting him out of the building.  Abouammo had already resigned from Twitter months earlier.  Thereafter, Twitter cooperated with the Federal Bureau of Investigation and U.S. Department of Justice investigation into

---

[1] Throughout this brief, all emphases within quotations are added and all internal citations are omitted unless otherwise noted.

Alzabarah and Abouammo's activities.  Twitter also sent notices to individuals whose accounts had potentially been accessed without authorization, including multiple notices to Al-Ahmed. On November 5, 2019, as a result of its investigation, the DOJ filed a criminal complaint against Alzabarah, Abouammo, and a third individual who aided the KSA in its efforts to illegally access Twitter account information.  This lawsuit comes more than four years after Twitter discovered and stopped the KSA's activities, more than four years after Twitter notified Al-Ahmed of the unauthorized intrusion of his account, and more than two years after the suspension of Al-Ahmed's Twitter account in May 2018 (an event unrelated to the KSA's espionage).

Al-Ahmed's FAC fails to state a claim against Twitter and should be dismissed in its entirety for numerous, independent reasons.  *First*, Al-Ahmed lacks Article III standing to pursue any claims against Twitter based on the KSA's alleged espionage because the FAC fails to plead an injury-in-fact that is fairly traceable to Twitter's conduct.  *Second*, as a result of Al-Ahmed's delay in filing suit despite having notice of the underlying facts, eight of his nine causes of action against Twitter are either partly or entirely time-barred.  *Third*, the FAC's claims premised on the KSA's alleged espionage at Twitter rely on holding Twitter vicariously liable for its employees' torts, but Al-Ahmed has failed to plead—and cannot plead—facts showing that Twitter is vicariously liable.  *Fourth*, Section 230(c)(1) of the Communications Decency Act ("CDA") bars Al-Ahmed's claims based on Twitter's suspension of his account.  *Fifth*, Al-Ahmed's free speech claim fails because Twitter is not a governmental actor and is thus not subject to the Free Speech Clause of the First Amendment.  *Sixth*, Al-Ahmed fails to satisfy Rule 9(b)'s heightened pleading standard for his fraudulent inducement claim.  *Seventh*, Al-Ahmed does not adequately allege the elements of his invasion-of-privacy claim.  *Eighth*, Al-Ahmed fails to plead facts sufficient to support his negligence and reckless endangerment claims.  And, *ninth*, Twitter's Terms of Service ("TOS") bars several of the FAC's claims.

The FAC contains these flaws because Al-Ahmed has sued the wrong party.  Twitter recognizes the seriousness of Al-Ahmed's allegations, which paint a picture of persistent state-sponsored abuse perpetrated against him and his associates.  However, these actions are alleged

to have been perpetrated by the KSA, not by Twitter.  Twitter did not spy on Al-Ahmed's

account or harass his friends and associates; nor did it abet the KSA's alleged conduct.

Accordingly, Al-Ahmed's FAC should be dismissed in its entirety.  Alternatively, if the Court

does not dismiss the FAC, this action should be transferred to the Northern District of California

pursuant to the valid and enforceable forum-selection clause in Twitter's TOS.

## II.   BACKGROUND

### A.   Al-Ahmed is a well-known and public critic of the KSA and, as a result of his public criticism, was the subject of harassment by the KSA.

Al-Ahmed is "one of the leading political dissidents" of the KSA and was granted asylum

in the United States because he faced "imminent persecution" in his native country, Saudi

Arabia.  FAC ¶ 5.  As a result of his "prominent social media presence" and "persistent critique

of the KSA," the Saudi government has "consistently attempted to—quite literally—silence his

voice, even going so far as to attempt to kidnap and kill him on multiple occasions."  *Id.* ¶¶ 10-

11.  The KSA also stripped Al-Ahmed of his "Saudi nationality and has kept him under vigilant

surveillance."  *Id.*  Al-Ahmed's public criticism of the KSA has garnered him a large social

media following, including 36,000 followers on his now-suspended Arabic-language Twitter

account (*id.* ¶ 14), and almost 14,000 followers on his still active English-language account

(@AliAlAhmed_en).  Motion Requesting Judicial Notice ("RJN"), Ex. A. [2]  As a commentator

on Saudi affairs, he has been a regular guest on news programs (*e.g.*, CBS News, CNN) and has

been featured in numerous news publications (*e.g.*, Washington Post, USA Today).  FAC ¶ 13.

---

[2] As set forth in Twitter's concurrently filed RJN, the Court may take judicial notice of these facts in ruling on Twitter's motion to dismiss.  Exhibits A-D are exhibits to the concurrently filed Declaration of Anjali Srinivasan and Exhibits 1-6N are exhibits to the concurrently filed Declaration of Twitter Employee.  In light of the allegations set forth in the complaint and in the criminal indictment, Twitter has filed concurrently with this brief a request to seal the identity of its employee declarant.  Accordingly, Twitter refers to the declarant solely as "Twitter Employee" in this memorandum.

**B.     In 2014, the KSA recruited Abouammo and Alzabarah to gain access to Twitter account information.**

According to the FBI's investigation, in 2014, Twitter and certain of its accountholders became targets of KSA espionage. *See United States v. Abouammo, et al.*, Case No. 3:19-cr-000621-EMC (N.D. Cal.), ECF No. 53. The KSA allegedly recruited two Twitter employees, Abouammo and Alzabarah, to access Twitter account information. *Id.*; FAC ¶ 15 (citing *Abouammo*, ECF No. 53). Both individuals are now facing criminal charges in the Northern District of California. *Abouammo*, ECF No. 53.

Alzabarah worked as a site reliability engineer at Twitter from approximately August 2013 until December 2015. *Id.* ¶ 13. Abouammo, a United States citizen, was employed by Twitter from November 2013 to May 2015 as a Media Partnerships Manager responsible for the Middle East and North Africa. *Id.* ¶¶ 2, 12. In that role, he assisted notable Twitter accountholders in that region with their Twitter content and strategy. *Id.* ¶ 12.

As described in the DOJ's superseding indictment, cited by the FAC (FAC ¶ 15), in December 2014, Abouammo, acting on behalf of the KSA, began accessing certain Twitter accountholder information without Twitter's authorization. *Abouammo*, ECF No. 53, ¶¶ 21-28. Abouammo resigned from Twitter in May 2015 but continued to contact Twitter on behalf of the KSA. *Id.* ¶ 26(k)-(l). Around May 2015, Alzabarah, also acting on behalf of the KSA, began secretly accessing Twitter account information without Twitter's authorization. *Id.* ¶ 26(n)-(o). Abouammo and Alzabarah's access of account information were direct violations of their employment obligations and of Twitter's written policies. *Id.* ¶¶ 14-19.

After learning from federal authorities about the potential espionage, on December 2, 2015, Twitter placed Alzabarah on leave, seized his Twitter-owned laptop, and escorted him from the building. *Abouammo*, ECF No. 53, ¶ 26(s); *see also Abouammo*, ECF No. 1, ¶ 85. Abouammo had already left the company earlier that year. *Abouammo*, ECF No. 53, ¶ 26(k). Thereafter, Alzabarah fled to Saudi Arabia, *id.* ¶ 26(s)-(u), and Twitter cooperated with the FBI's

investigation into Abouammo and Alzabarah's activities.  On November 5, 2019, the DOJ filed criminal charges against Abouammo and Alzabarah.  *Abouammo*, ECF No. 1.

  **C.**  **Twitter informed individuals whose accounts may have been compromised.**

  As set forth in Twitter's concurrently filed RJN, on or about December 11, 2015, Twitter sent out notices to holders of accounts that appeared to have been accessed on behalf of the KSA. *See* RJN, Exs. 1 and 2.  The notice advised that: "As a precaution, we are alerting you that your Twitter account is one of a small group of accounts that may have been targeted by state-sponsored actors."  *Id.*

  Twitter sent this notification to Al-Ahmed on December 11, 2015 in two ways.  *See* RJN, Exs. 1 and 2.  First, via the email address that Al-Ahmed had provided to Twitter.  RJN, Ex. 1, Ex. 3 at 2.  And second, through an in-app message that advised Al-Ahmed as follows:



RJN, Ex. 2, Ex. 4 at 24.  *See also Abdulaziz v. Twitter, Inc., et al.*, Case No. 3:19-cv-06694-LB (N.D. Cal.)[3], ECF No. 76 (attached hereto as Ex. B.) (hereinafter "Order Granting Motion to Dismiss") at n.58 (taking notice of the same December 11, 2015 e-mail and in-app notices sent by Twitter in granting Twitter's motion to dismiss).

---

[3] In 2019, another Saudi dissident Omar Abdulaziz brought similar claims against Twitter in the Northern District of California premised on the 2015 Saudi espionage at Twitter.  That court recently dismissed his claims on grounds generally applicable here.  *See Abdulaziz*, Order Granting Motion to Dismiss (Ex. B).

1391737

**D.      Al-Ahmed did not personally suffer personal harm as a result of the KSA's espionage at Twitter.**

Al-Ahmed does not allege that he suffered any personal harm as a result of the KSA's espionage at Twitter.  Rather, he vaguely alleges that *other Twitter users* who followed his account or communicated with him through private messaging "have disappeared, been arrested, or have been executed."  FAC ¶ 20.  Further, the only specific example of such third-party harm he identifies is the case of a Saudi dissident Abdullah al-Hamid, who was jailed by the KSA in 2013—at least a year before the KSA's intrusion of Twitter accounts.  *Id.*; *see also id.* at n.6.

**E.      Al-Ahmed's Arabic-language Twitter account was suspended in May 2018.**

Nearly three years after Al-Ahmed was notified of the unauthorized intrusion of his account, Twitter suspended his Arabic-language Twitter account.  FAC ¶ 21.  The account was suspended after Al-Ahmed repeatedly directed abusive language at other Twitter users.  The final incident that led to the suspension was his transmission of the following message (translated from Arabic), which was reported to Twitter by the recipient:

> Damn your mother, you Ahmari, you mountain monkey, you Ethiopian, you slave, you pagan, you cow, you beast of burden! You, slave, are the last one who should be talking. A son of Saud will fuck you, you polytheist, you son of a monkey! I see your face and your teeth sticking out. Damn your father and Khomeini, you slave, you beast of burden, you animal!

*See* RJN, Ex. 5; *see also* Twitter Employee Decl. at ¶ 7.  The suspension applied only to Al-Ahmed's Arabic-language account; his English-language account is still active.  *See* RJN, Ex. A.

## III.      THE FAC SHOULD BE DISMISSED IN ITS ENTIRETY

**A.      The FAC fails to establish personal jurisdiction over Twitter.**

The Court may exercise personal jurisdiction over Twitter only to the extent permitted by New York's long-arm statute and the requirements of constitutional due process.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  There are two theories of personal jurisdiction: general jurisdiction and specific jurisdiction.  *Id.*  Under either theory, "the plaintiff bears the burden of establishing that the court has [personal] jurisdiction over the defendant."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  Al-Ahmed has not done so.

6

1391737

1.      **Twitter is not subject to general jurisdiction in New York.**

With respect to general jurisdiction, the inquiry under New York's long-arm statute, CPLR Section 301, is the same as the constitutional due process inquiry. *Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 431-432 (S.D.N.Y. 2019). Due process dictates that barring "exceptional" circumstances, a corporation is subject to general jurisdiction only where it is incorporated and has its principal place of business—*i.e.*, where it is "at home." *BNSF*, 137 S. Ct. at 1558; *see also Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014). Twitter is incorporated in Delaware, and its principal place of business is in San Francisco, California. FAC ¶ 6. Thus, it is not "at home" in New York. That Twitter has an office in New York, *id.* ¶ 3, does not qualify as an "exceptional" circumstance sufficient to subject Twitter to general jurisdiction in New York. *See BNSF*, 137 S. Ct. at 1559 (declining to hold that a corporation's 2,000 employees in Montana subjected it to general jurisdiction there because "[a] corporation that operates in many places can scarcely be deemed [to be] at home in all of them."); *see also Lopez v. Shopify, Inc.,* No. 16 Civ. 9761 (VEC) (AJP), 2017 WL 2229868, at *7 (S.D.N.Y. May 23, 2017) (holding that even though defendant has multiple customers and an office in New York, there is no general jurisdiction). Thus, this Court does not have general jurisdiction over Twitter.

2.      **Twitter is not subject to specific jurisdiction in New York.**

Under CPLR Section 302, specific jurisdiction exists where (1) the defendant transacts business in New York; and (2) when the cause of action arises from that business. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). Similarly, due process dictates that a court may only exercise specific jurisdiction if the claims "***arise out of or relate*** to the defendant's contacts with the forum state." *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1780 (2017). Thus, whether considered under New York's long-arm statute or as a matter of constitutional due process, "there must be an affiliation between the forum and the underlying controversy." *Pettenato v. Beacon Health Options, Inc.*, 425 F. Supp. 3d 264, 274 (S.D.N.Y. 2019). But here, Al-Ahmed does not allege that his claims are affiliated with or arise out of Twitter's conduct in New York. To the contrary, he alleges that "a substantial part of the acts

7

and omissions giving rise to the claims asserted herein occurred in California," and that California law applies to his claims. FAC ¶ 4. Accordingly, this Court does not have specific jurisdiction over Twitter. Thus, because Al-Ahmed has failed to establish personal jurisdiction over Twitter, the Court should dismiss his FAC in its entirety. *See* Fed. R. Civ. P. 12(b)(2)

> **B.** **Al-Ahmed fails to establish Article III standing to pursue claims against Twitter related to the alleged 2014-2015 KSA espionage.**

Al-Ahmed's claims arise from two separate alleged events: (1) the KSA's 2014 and 2015 intrusion of Twitter accounts, which led to certain of Al-Ahmed's Twitter account information being exposed; and (2) the May 2018 suspension of Al-Ahmed's Arabic-language Twitter account. The following seven causes of action asserted in the FAC are based at least in part on the KSA's alleged espionage: violation of the Stored Communications Act ("SCA") (FAC ¶ 29); breach of contract (*id.* ¶ 40a-c); tortious invasion of privacy (*id.* ¶ 51); negligent hiring, training, and supervision ("negligent hiring") (*id.* ¶ 64); breach of the implied covenant of good faith and fair dealing (*id.* ¶ 72); reckless endangerment (*id.* ¶ 75); fraudulent inducement (*id.* ¶ 83), and free speech (*id.* ¶ 95). But Al-Ahmed lacks standing to pursue claims against Twitter based on the KSA's espionage, and thus, to the extent these claims are premised on that event, they must be dismissed. *See* Fed. R. Civ. P. 12(b)(1).

To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). Here, Al-Ahmed has not pleaded an "injury in fact" that is "fairly traceable" to Twitter's alleged conduct.

*First*, Al-Ahmed bears the burden to plead (and ultimately prove) "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). While Al-Ahmed alleges that Abouammo and Alzabarah accessed his account information in 2014 and

2015, he alleges no facts establishing that any of the harms allegedly perpetrated by the KSA resulted from the KSA's intrusion of Twitter accounts specifically.  In particular, Al-Ahmed has not identified any specific account information that was improperly accessed and used by the KSA to inflict any harm.  Moreover, the only concrete example of harm pleaded in the FAC occurred **before** Abouammo and Alzabarah's misconduct.  *See* FAC ¶ 20, n.6 (discussing the death of Saudi dissident Abdullah al-Hamid who had been imprisoned since 2013—at least a year prior to any alleged intrusion of Al-Ahmed's Twitter account information).  Further, the FAC concedes that it was Al-Ahmed's **public criticism** of the Saudi government that made him a target of the KSA's harassment and persecution, and that he had been such a target for years even prior to the KSA's intrusion of Twitter accounts.  *Id.* ¶¶ 5, 10-14.  Accordingly, because the KSA—not Twitter—is the cause of any alleged persecution, Al-Ahmed lacks Article III standing to assert claims against Twitter.  *See Abdulaziz*, Order Granting Twitter's Motion to Dismiss (Ex. B) at 11 ("[P]laintiff does not explain how the compromise of the Twitter data caused the harm. . . . Indeed, he is a political dissident with an active social-media presence who suffered persecution before . . . .").

 *Second*, to establish "injury in fact," a plaintiff must also allege a "particularized" injury, meaning one that "affect[s] the plaintiff in a personal and individual way."  *Spokeo*, 136 S. Ct. at 1548.  Al-Ahmed alleges that Abouammo and Alzabarah accessed his account information, FAC ¶ 17, and that as a result, "several Twitter users, who either followed [his] Twitter account and/or had direct contact with him through the use of private messaging, have disappeared, been arrested, or have been executed."  *Id.* ¶ 20.  But allegations of harm to third parties and not to Al-Ahmed personally do not satisfy Article III's "injury in fact" requirement.  *Lujan*, 504 U.S. at 563.  ("[T]he 'injury in fact' test requires . . . that the party seeking review be himself among the injured."); *see also Spokeo*, 136 S. Ct. at 1548.[4]  While the FAC conclusorily seeks assorted

---

[4] Al-Ahmed also alleges that Abouammo and Alzabarah used "Twitter's internal resources to identify Mr. Al-Ahmed as a critic of the government."  FAC ¶ 16.  This bald and conclusory allegation is, of course, contradicted by Al-Ahmed's own allegation that he is a "prominent" and "leading" critic of the KSA and has long been persecuted by the KSA as a result.  *Id.* ¶¶ 5, 10-14.

1391737

damages, s*ee, e.g.*, FAC ¶¶ 32-33, those allegations do not contain well-pleaded facts establishing harm to Al-Ahmed personally.  Thus, these conclusory allegations are insufficient to establish Article III standing.  *See, e.g.*, *Parker Madison Partners v. Airbnb, Inc.*, 283 F. Supp. 3d 174, 181 (S.D.N.Y. 2017) (dismissing complaint for lack of Article III standing where plaintiff pleaded generalized damages but did not "include a single example or give any details whatsoever as to any actual injury to [p]laintiff").  Because he has failed to establish an "injury in fact" or a "causal nexus," Al-Ahmed's claims based on the 2014 and 2015 KSA espionage should be dismissed.

C.    **Most of Al-Ahmed's causes of action should be dismissed as time-barred.**

Statutes of limitations are designed to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."  *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013).  A claim typically accrues "when the plaintiff has a complete and present cause of action."  *Id.* Under the discovery rule, however, "[t]he clock begins to run when the plaintiff has 'inquiry notice' of his injury, namely when he discovers or reasonably should have discovered the . . . injury."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012).

Because Al-Ahmed waited more than four-and-a-half years after the KSA's espionage, and more than two years after his account suspension to bring this action, eight of the nine causes of action he asserts in the FAC are time-barred: (1) his SCA, invasion of privacy, negligent hiring, reckless endangerment, and interference with prospective economic advantage claims are barred in their entirety; and (2) his breach of contract (FAC ¶ 40a-c), implied covenant of good faith and fair dealing (*id.* ¶ 72), and fraudulent inducement claims (*id.* ¶ 81) are time-barred to the extent premised on the KSA's 2014 and 2015 account intrusion.

**1.      Al-Ahmed was notified of the unauthorized intrusion of his Twitter account more than four-and-a-half years before filing suit.[5]**

On December 11, 2015, Twitter sent Al-Ahmed two notices—one via email and a second through the Twitter application—alerting him that his account information had been exposed, and the Court may take judicial notice of those facts.  *See* RJN, Exs. 1-4; *see also Abdulaziz*, Order Granting Motion to Dismiss (Ex. B) at 11 and n.58 (taking judicial notice of the same December 11, 2015 e-mail and in-app notices sent by Twitter).  Applying the discovery rule, Al-Ahmed's claims relating to the unauthorized intrusion into his Twitter account thus accrued no later than December 2015.  At that point, due to Twitter's notifications, he had discovered or should have discovered the injury."  *Koch*, 699 F.3d at 148.

Al-Ahmed's SCA, invasion of privacy, negligent hiring, and reckless endangerment claims each have two-year statutes of limitations.[6]  His fraudulent inducement claim has a three-year statute of limitations,[7] and his breach of contract and breach of implied covenant of good faith and fair dealing claims have a four-year limitations period.[8]  By waiting four-and-a-half years after learning of the unauthorized access of his account, Al-Ahmed forfeited his right to pursue these claims, and they should therefore be dismissed to the extent premised on the KSA's 2015 espionage activities.[9]  *See Abdulaziz*, Order Granting Motion to Dismiss (Ex. B) at 12

---

[5] Al-Ahmed asserts that California law applies to his claims.  FAC ¶ 4.  Accordingly, Twitter analyzes Al-Ahmed's state-law claims under applicable California law.

[6] 18 U.S.C. § 2707(f) (two years for SCA claims); Cal. Civ. Proc. Code § 335.1 (two years for injury to a person); *see Quan v. Smithkline Beecham Corp.*, 149 F. App'x 668, 670 (9th Cir. 2005) (applying a two-year period to invasion privacy claim); *Kaldis v. Wells Fargo Bank, N.A.*, 263 F. Supp. 3d 856, 867 (C.D. Cal. 2017) (applying two-year period for negligent hiring claim); *Hartline v. Nat'l Univ.*, No. 2:14-CV-0635 KJM AC (PS), 2015 WL 4716491, at *9 (E.D. Cal. Aug. 7, 2015), *report and recommendation adopted*, No. 2:14-CV-0635 KJM AC (PS), 2016 WL 426643 (E.D. Cal. Feb. 4, 2016) (noting that to the extent there is a civil cause of action for "reckless endangerment," it is subject to a two-year statute of limitations).

[7] Cal. Civ. Proc. Code § 338(d) (three years for actions based on fraud or mistake); *see Perez v. Gen. Motors LLC*, No. 3:19-CV-00038-L-NLS, 2019 WL 3766613, at *1-3 (S.D. Cal. Aug. 9, 2019) (applying a three-year limitations period to a fraudulent inducement claim).

[8] Cal. Civ. Proc. Code § 337(a) (four-year statute of limitations for claims on written contracts); *Fehl v. Manhattan Ins. Grp.*, No. 11-CV-02688-LHK, 2012 WL 10047, at *4 (N.D. Cal. Jan. 2, 2012) ("A claim for the covenant of good faith and fair dealing has a two-year statute of limitations when it sounds in tort, and a four-year statute of limitations if it sounds in contract.").

[9] Al-Ahmed's breach of contract, implied covenant of good faith and fair dealing, and fraudulent

(holding that similar claims based on the same acts of Saudi espionage began accruing as of Twitter's December 2015 notifications, and accordingly dismissing claims based on their statutes of limitations.)

### 2. Al-Ahmed waited more than two years after his account suspension before initiating this action.

Al-Ahmed's Arabic-language Twitter account was suspended on or about May 2018—more than two years before he filed suit.  FAC ¶ 21.  Because his intentional interference with prospective economic advantage claim, which is premised on the account suspension, carries a two-year statute of limitations,[10] this claim is time-barred as well.

### D.   Twitter is not vicariously liable for the KSA's conduct.

Al-Ahmed's SCA (FAC ¶ 29), invasion of privacy (*id.* ¶ 51), breach of contract (*id.* ¶ 40a-c), breach of the implied covenant of good faith and fair dealing (*id.* ¶ 72), fraudulent inducement (*id.* ¶ 83), and free speech (*id.* ¶ 95) claims  all seek—at least, in part—to hold Twitter vicariously liable for Abouammo and Alzabarah's conduct under a theory that Twitter "ratified" their illegal actions: (1) by concealing Abouammo and Alzabarah's misconduct from him; (2) by suspending his Arabic Twitter account; and (3) because Twitter's CEO[11] met with and was photographed with the KSA's leader, Mohammad Bin Salman ("MBS").  *Id.* ¶¶ 30-31. But these allegations do not support a ratification theory.

Under California law, "an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort."  *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1110 (2009).  Subsequent ratification refers to the employer's approval or adoption of the employee's conduct as its own.

---

inducement claims rely on both KSA's actions of espionage and the suspension of his Twitter account.  They are time-barred only to the extent based on the alleged espionage, but are also subject to dismissal in their entirety for myriad other reasons discussed herein.

[10] In California, the statute of limitations is two years for interference with contract or interference with prospective business advantage claims.  Cal. Civ. Proc. Code § 339(1); *Tu-Vu Drive-In Corp. v. Davies*, 66 Cal.2d 435, 437 (1967).

[11] Contrary to the FAC, Jack Dorsey is Twitter's CEO, not its Chairman.  *See* FAC ¶ 31.

*Id.* at 1110-11.  For example, in *Tenet Healthcare*, the court held that the plaintiff had adequately pleaded a ratification theory of liability where she alleged that the employer knew of the employee's torts for years and failed to take any action to stop him, never disciplined him, and concealed his crimes so he could continue to commit them.  *Id.* at 1112; *see also Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 852 (1998) ("If the employer, after knowledge of or opportunity to learn of the agent's misconduct, continues the wrongdoer in service, the employer may become an abettor and may make himself liable[.]").  In contrast, in *Ramos v. Los Rios Community College District*, No. CV 2:17-1458 WBS KJN, 2018 WL 626381, at *1 (E.D. Cal. Jan. 29, 2018), the court dismissed plaintiff's ratification-based claim where the facts alleged showed that the employer had investigated and responded to complaints about the employee, and therefore had not adopted or approved his conduct.  Similarly, in *Delfino v. Agilent Technologies, Inc.*, 145 Cal. App. 4th 790 (2006), the court held that the defendant employer could not be liable under a ratification theory where the employer had terminated the wrongdoer-employee after discovering his torts, and thus had not approved the torts.  *Id.* at 810-11.

Applying the standards established by those cases, Al-Ahmed fails to state a claim that Twitter ratified the illegal actions of its rogue employees.  Al-Ahmed does not allege that Twitter failed to investigate, sanction, or otherwise address Abouammo and Alzabarah's wrongdoing, or that Twitter in any way assisted them in their misconduct, or otherwise demonstrated approval or adoption after the fact.  To the contrary, Al-Ahmed's FAC alleges that Twitter was not aware of Abouammo and Alzabarah's misconduct at the time they committed it.  *See* FAC ¶ 19.  Further, the superseding indictment against Abouammo and Alzabarah, which Al-Ahmed references in his FAC (*id.* at n.3), makes clear that, much like the *Delfino* and *Ramos* cases, after Twitter discovered Abouammo and Alzabarah's misconduct, Twitter put a stop to it, including by removing Alzabarah from his position and by cooperating with a criminal investigation into both employees' misdeeds.  *See Abouammo*, ECF No. 53, ¶ 26(k) and (s); FAC ¶ 21 n.7 (acknowledging Twitter's cooperation with a federal investigation into Abouammo and Alzabarah).

13

Al-Ahmed's (incorrect) assertion that Twitter concealed Abouammo and Alzabarah's misconduct from him also does not make out a ratification claim. *First*, judicially noticeable facts confirm that Twitter sent Al-Ahmed multiple notices in December 2015 about the unauthorized intrusion of his account. *See* RJN, Exs. 1-4; *see also Abdulaziz*, Order Granting Motion to Dismiss (Ex. B) at 11-12 (taking judicial notice of Twitter's December 2015 notifications, and holding that those notifications were enough to "defeat[] any claim that Twitter ratified its employees' conduct"). *Second*, even if Twitter had not notified Al-Ahmed of the unauthorized intrusion of his account, an alleged failure to personally notify Al-Ahmed is far short of an effort by Twitter to adopt Alzabarah and Abouammo's conduct as its own. Further, Al-Ahmed's complaint that his Arabic-language Twitter account was suspended bears no relationship to the Saudi espionage and simply does not support a claim for ratification. Finally, Al-Ahmed's allegation that Twitter CEO Jack Dorsey met with and was photographed with MBS months after these incidents also does not establish a ratification theory. Nothing about that meeting reflects Twitter's approval of Abouammo or Alzabarah's conduct, particularly since by that point Twitter had removed Alzabarah; Abouammo had left the company; and Twitter was cooperating with an investigation into both of them. *See Abouammo*, ECF No. 53, ¶ 26(k) and (s); FAC ¶ 21 n.7.

Accordingly, Al-Ahmed has not pleaded any facts that Twitter adopted Alzabarah and Abouammo's actions, and thus has failed to state a claim for ratification. Therefore, his SCA and invasion-of-privacy claims should be dismissed in full, and his breach of contract, breach of implied covenant of good faith and fair dealing, fraudulent inducement, and free speech claims should be dismissed to the extent premised on Abouammo or Alzabarah's conduct.[12]

---

[12] Appearing solely in the bolded title of his SCA cause of action, Al-Ahmed appears to suggest that Twitter should be held vicariously liable for violating the SCA under a *respondeat superior* theory. *See* FAC at p. 10. But this liability theory fails as well. *Respondeat superior* requires that the employees' torts be inherent, typical, or expected by the employer in the course of the employee's duties. *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 298 (1995). But Abouammo and Alzabarah's spying on behalf of the KSA was not part of their job duties, or otherwise expected or typical. Indeed, the FAC concedes that the Abouammo and Alzabarah's espionage was prohibited by Twitter's policies, and not within their job duties. *See* FAC ¶¶ 18-

### E.      CDA Section 230(c)(1) bars Al-Ahmed's account suspension-related claims.

The following claims asserted in the FAC are based at least in part on the suspension of Al-Ahmed's Arabic-language Twitter account: breach of contract (FAC ¶ 40d-f), interference with prospective economic advantage (*id.* ¶ 47), breach of the covenant of good faith and fair dealing (*id.* ¶ 72), and free speech (*id.* ¶ 95).  Twitter, however, is immune from liability for such claims.

Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  Like most circuits, the Second Circuit has concluded that "the text of Section 230(c)(1) should be construed broadly in favor of immunity."  *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 936 (May 18, 2020).  Even the FAC concedes that the CDA "generally shields social media outlets from complaints of censorship[.]"  FAC ¶ 89.  Here, there can be no dispute that Al-Ahmed's claims based on the suspension of his Arabic-language Twitter account are barred by Section 230(c)(1).  "Indeed, Twitter provides the 'prototypical service' entitling it to the protections of this statute, as it provides a forum for individuals to post comments, (or 'tweets,' to give them their *nom de guerre*), to which others may then respond."  *Wilson v. Twitter*, No. 3:20-CV-00054, 2020 WL 3410349, at *11 (S.D. W. Va. May 1, 2020), *report and recommendation adopted*, No. CV 3:20-0054, 2020 WL 3256820 (S.D. W.Va. June 16, 2020).

Specifically, Section 230(c)(1) immunity applies where "(1) [the defendant] is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information."  *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016); *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268 (9th Cir. 2016).

---

19; *see also Abouammo*, ECF No. 53, ¶¶ 14-20 (recognizing that Abouammo and Alzabarah's access of account information on behalf of the KSA violated their employment obligations and Twitter's written policies).  Accordingly, Al-Ahmed has failed to plead *respondeat superior* liability.  *See also Abdulaziz*, Order Granting Motion to Dismiss (Ex. B) at 12.

1391737

Each of these elements is satisfied in this instance.  *First*, the CDA broadly defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]"  47 U.S.C.  § 230(f)(2).  Numerous courts have recognized Twitter is an interactive computer service as defined by the CDA.  *See, e.g.*, *Am. Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016) (holding that Twitter is interactive computer service under the CDA); *Brittain v. Twitter, Inc.*, No. 19-CV-00114-YGR, 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019) ("The Court finds that Twitter qualifies as an interactive computer service.").

*Second*, the CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3); *see also Force*, 934 F.3d at 71 (holding that Facebook was not the "information content provider" of content posted by affiliates of a terrorist organization).  Al-Ahmed is clearly the "information content provider" because he is the sole creator of the content associated with his Arabic-language Twitter account, including the harassing direct messages that led to his account suspension.  *See* RJN, Ex. 5 (*e.g.*, "Damn your mother, you Ahmari, you mountain monkey, you Ethiopian, you slave, you pagan, you cow, you beast of burden!").  Twitter, in contrast, had no role in "creat[ing] or "develop[ing]" this content.  *See Force*, 934 F.3d at 71 (applying Section 230(c)(1) after finding that "Facebook did not 'develop' the content of the Facebook postings" at issue).

*Third*, "[a]t its core, [Section 230] bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content."  *LeadClick Media*, 838 F.3d at 174.  Simply put, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."  *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157, 1170-71 (9th Cir. 2008); *see also Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018) ("[T]he very essence of publishing is making the decision whether to print or retract a given piece of content.").  For example, in *Wilson*, the plaintiff

16

sought to hold "Twitter liable for its decision to delete his posts and terminate (or withdraw) his account."  2020 WL 3410349, at *12.  The court rejected this theory and dismissed the plaintiff's First Amendment and Civil Rights Act claims, finding that "Twitter's decision to suspend Wilson's accounts, based on tweets that reportedly used derogatory slurs for homosexuality, was reached in the course of a traditional editorial function—namely deciding what type of content to publish" and that "Wilson's claim is precluded by application of § 230(c)(1) of the CDA."  *Id.*; *see also, e.g., Mezey v. Twitter, Inc.*, No. 1:18-CV-21069-KMM, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) (dismissing lawsuit claiming that Twitter "unlawfully suspended [the plaintiff's] Twitter account" on grounds of Section 230(c)(1) immunity).

Pursuant to CDA Section 230(c)(1), Al-Ahmed's account-suspension-related claims— interference with prospective economic advantage, in full, and breach of contract, breach of the implied covenant of good faith and fair dealing, and free speech, in part—should be dismissed.

### F.    Al-Ahmed cannot state a Free Speech claim against Twitter.

Al-Ahmed attempts to avoid application of Section 230 immunity to his Free Speech claim by arguing that Twitter "failed to conduct itself as a traditional publisher" because it disclosed his information and suspended his account "on behalf of a governmental actor"—the KSA.  FAC ¶ 90.  To be clear, Twitter has never acted on behalf of the KSA.  But even so, this is simply not a cognizable legal theory.  The Free Speech Clause of the First Amendment "prohibits only *governmental* abridgment of speech" and "does not prohibit *private* abridgment of speech."  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).  Further, "merely hosting speech by others … does not alone transform private entities into state actors subject to First Amendment constraints."  *Id.* at 1930; *see also Wilson*, 2020 WL 3410349, at *5 ("Twitter is a private entity and is not subject to the state-action doctrine.").

Al-Ahmed tries to get around this fundamental constitutional principle by asserting the novel theory that because members of the Saudi Royal Family allegedly own approximately five percent of Twitter's stock—and again, Twitter is a publicly traded company—that Twitter was

"acting on behalf of a governmental actor, albeit a foreign one" when it exposed his information and suspended his Arabic-language account.  FAC ¶¶ 90-92; *see also id.* ¶ 7.  But the mere allegation that Saudi family members may own a minority of Twitter's public stock does not transform Twitter into an arm of the KSA.  Moreover, Al-Ahmed's claim fails for the independent reason that the First Amendment applies only to actions by federal, state, or local governments *of the United States*, not foreign governments.  *See* U.S. Const. amend. I (referring to acts of "Congress"); *see also Gitlow v. New York*, 268 U.S. 652 (1925) (applying the First Amendment to the states through the Due Process Clause of the Fourteenth Amendment.).

### G.    Al-Ahmed's fraudulent inducement claim fails to satisfy Rule 9(b)'s heightened pleading requirement.

To state a claim for fraudulent inducement under California law, Al-Ahmed must allege the following elements: "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *McColgan v. Mut. of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233 (E.D. Cal. 2014).  Under Rule 9(b), fraud must be pleaded with particularity.  Fed. R. Civ. P. 9(b).  Because the FAC fails to allege these required elements with particularity, Al-Ahmed's fraudulent inducement claim should be dismissed.

*First*, Al-Ahmed fails to plead with particularity an alleged misrepresentation—as required by the first element.  To satisfy Rule 9(b)'s heightened requirements, a plaintiff must do more than merely identify an alleged misrepresentation, he must also "set forth what is false or misleading about a statement, and why it is false."  *Express Cos., Inc. v. Lifeguard Med. Sols., LLC*, No. 10CV178-WQH-WMC, 2010 WL 11508847, *3 (S.D. Cal. Sept. 1, 2010).  Here, Al-Ahmed conclusorily alleges that Twitter misrepresented to him that it would maintain a perfectly secure platform (FAC ¶ 81), but he does not identify any actual representation by Twitter to that effect.  *See Minkler v. Apple, Inc*., 65 F. Supp. 3d 810, 821 (N.D. Cal. 2014) (dismissing plaintiff's fraud claim where she had not pled with particularity any specific statement by defendant Apple that its Maps function would "always work flawlessly and without error").

1391737

Moreover, Twitter's TOS have consistently told users:  "Your access to and use of the Services or any Content are at your own risk.  You understand and agree that the Services are provided to you on an 'AS IS' and 'AS AVAILABLE' basis."  RJN, Ex. 6N at 8, *see also* Exs. 6A-M.  The TOS further states, in direct contradiction to the FAC's allegations, that the "Twitter Entities make no warranty or representation and disclaim all responsibility and liability for . . . [the] *security* … of the Services or any Content…."  RJN, Ex. 6N at 8; *see also* Exs. 6A-M.

*Second*, Al-Ahmed does not allege facts establishing that Twitter *knowingly* made a false statement—the second element.  Rather, he claims vaguely that Twitter "knew or should have known there was an inherent conflict between maintaining such a platform and their [sic] beneficial ownership by the KSA and desire to retain market share in the KSA; a closed and undemocratic society known to impose extreme sanctions upon dissenters."  FAC ¶ 82.  But this does not establish that Twitter knew that the KSA had recruited Twitter employees to engage in espionage against Twitter, much less any intent by Twitter to then misrepresent this fact to Al-Ahmed.  Rather judicially noticeable evidence shows that after Twitter discovered the KSA's espionage, it took immediate steps to notify users such as Al-Ahmed, of the state-sponsored intrusion of their accounts.  RJN, Exs. 1-2; *see also Abouammo*, ECF No. 53, ¶ 26(k) and (s).

*Third*, the FAC fails to allege facts sufficient to establish the third element—that Twitter intended to induce Al-Ahmed's reliance on any misrepresentation that its platform was unimpeachably secure.  As discussed above, Twitter's TOS informs accountholders that Twitter cannot guarantee the platform's security and expressly warns that their use of Twitter is "at [their] own risk."  RJN, Ex. 6N at 8.  Further, when Twitter discovered its rogue employees' misconduct, it sent multiple notices to affected accountholders—including to Al-Ahmed.  RJN, Exs. 1-4; *see also* Twitter Employee Decl. ¶¶ 3-6.  Given these facts, Al-Ahmed cannot plausibly allege that Twitter intended for him to believe that Twitter's security would *never* be breached.

As Al-Ahmed has failed to plead the elements of his fraudulent inducement claim with the requisite particularity, the claim should be dismissed.

1391737

### H.       Al-Ahmed fails to state a claim that Twitter violated his privacy.

Al-Ahmed has not alleged an actionable invasion of privacy under California law.  "The California Constitution sets a 'high bar' for establishing an invasion of privacy claim."  *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1038 (N.D. Cal. 2014).  To state a claim for invasion of privacy under the California Constitution, Al-Ahmed must demonstrate (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) a serious invasion of privacy constituting "an ***egregious*** breach of . . . social norms."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994).  These "threshold elements" permit courts to "weed out" at the pleading stage claims that do not rise to the level of a significant intrusion upon "a constitutionally protected privacy interest."  *Loder v. City of Glendale*, 14 Cal. 4th 846, 893 (1997).  Al-Ahmed's FAC fails as to the first and third of these "threshold elements."

As to the first element, Al-Ahmed fails to adequately plead a "legally protected privacy interest" because he fails to specify what private matters were intruded upon and how they were in fact private.  Under California law, non-specific allegations cannot form the basis of a privacy claim; rather, a plaintiff must provide "robust allegations" about the specific information allegedly invaded.  *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 973 (N.D. Cal. 2015); *see also In re Google Location History Litig.*, 428 F. Supp. 3d 185, 199 (N.D. Cal. 2019) (dismissing invasion-of-privacy claim for lack of "particular pleading" as to the confidential information allegedly invaded).  In *In re Yahoo Mail Litigation*, the court dismissed privacy claims premised on allegations that Yahoo had scanned the content of users' emails, holding that there is "no legally protected privacy interest and reasonable expectation of privacy in emails as a general matter" and that plaintiff must "plead ***specific email content*** in ***specific emails***" to establish a reasonable expectation of privacy.  7 F. Supp. 3d at 1040-42.  Al-Ahmed, however, offers no such specifics.  Rather, in conclusory fashion, he alleges that his "personal and highly sensitive information" was disclosed, FAC ¶ 8, and that information was disclosed concerning his "private life, career, and reputation."  *Id.* ¶ 54.  But such generic allegations do not suffice under California law.  *See In re Yahoo Mail*, 7 F. Supp. 3d at 1040-42.

1391737

Further, Al-Ahmed claims his improperly disclosed personal information includes his "e-mail addresses, contacts, phone numbers, birth dates, and internet protocol ("IP") addresses," FAC ¶¶ 17, 51, but he has made his e-mail addresses and phone number publicly available on the internet since as early as January 2014—before the alleged espionage occurred at Twitter.[13]  *See, e.g.*, RJN, Exs. C and D.  Al-Ahmed "cannot assert any privacy claim as to information [he] has already released to the public."  *Wasson v. Sonoma Cty. Jr. Coll. Dist.*, 4 F. Supp. 2d 893, 908 (N.D. Cal. 1997).  It is also implausible that the KSA did not already have his birthdate as he was a former Saudi national, and was born in Saudi Arabia.  *See* FAC ¶ 5.  In addition, Al-Ahmed's list of Twitter followers or "contacts" are publicly available on his Twitter account and to the extent Al-Ahmed is alleging that he had a legally protected privacy interest in his IP address, courts have recognized that IP addresses are not private by their very nature.  *See Chevron Corp. v. Donziger*, No. 12-MC-80237 CRB (NC), 2013 WL 4536808, at *10 (N.D. Cal. Aug. 22, 2013); *see also People v. Stipo,* 195 Cal. App. 4th 664, 669 (2011) (holding that IP addresses are not private because "this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information").[14]

As to the third element, courts regularly dismiss invasion-of-privacy claims under California law at the pleading stage for not establishing that the alleged conduct amounted to an "'egregious breach of the social norms' [necessary] to establish an invasion of privacy claim." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (collecting cases for the proposition that "[t]he California Constitution and the common law set a high bar for . . . invasion of privacy claim[s].").  Specifically, the "manner in which" an alleged invasion of privacy occurred impacts whether the alleged conduct constitutes an "egregious breach."  *Ruiz v.*

---

[13] Al-Ahmed alleges that the Abouammo and Alzabarah's espionage began "in or around August 2013," but the criminal complaint and superseding indictment he relies on in support of that position describe that activity as having begun in December 2014.  *See* FAC ¶ 15, n.2-3.

[14] Al-Ahmed's invasion of privacy claim also appears to seek recovery on behalf of other individuals whose private information he alleges was exposed.  *See, e.g.*, FAC ¶¶ 51, 53-54.  But as previously discussed in Section III.B, Al-Ahmed cannot pursue relief for others' alleged harms.

*Gap, Inc.*, 540 F. Supp. 2d 1121, 1127-28 (N.D. Cal. 2008).  For example, in *Ruiz*, the court held that the theft of a retail store's laptop containing personal information, including the social security numbers of job applicants, did not constitute an egregious breach of privacy by the retail store, which itself was an unwitting victim of the theft.  *Id.* at 1128; *see also Razuki v. Caliber Home Loans, Inc.*, No. 17-cv-1718LAB(WVG), 2018 WL 2761818 at *2 (S.D. Cal. June 8, 2018) (finding no "egregious breach of social norms" by defendant where third-party "hackers breached [defendant's] security and stole sensitive customer information").  So too here, where Twitter was the victim of foreign, state-sponsored espionage, its own conduct did not amount to an egregious breach of Al-Ahmed's privacy under the California constitution.  While Abouammo, Alzabarah, and the KSA may have engaged in egregious and criminal misconduct, Al-Ahmed cannot claim that Twitter's alleged failure to prevent those actions was itself an "egregious breach of social norms."

### I.   Al-Ahmed fails to plead facts necessary to support his negligent hiring and reckless endangerment claims.

Al-Ahmed asserts claims for negligence and reckless endangerment relating to Twitter's hiring, training, and supervision of Abouammo and Alzabarah.  FAC ¶¶ 61-67, 73-78.  At the outset, under California law, there is no tort claim for reckless endangerment.  *Brookins v. Rafferety*, 59 F. App'x 983, 983-84 (9th Cir. 2003); *see also Hartline*, 2015 WL 4716491, at *9.  But in any event, both claims fail for lack of any well-pleaded facts.

Under California law, there can be no liability for negligent supervision "in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised."  *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377, 395 (2000).  The same is true of negligent hiring and retention:  Al-Ahmed must establish that Twitter "knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materialize[d]."  *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996).  The general standard for recklessness is even higher, requiring Al-Ahmed to show that Twitter "kn[ew] or ha[d] reason to know of facts which would lead a reasonable man to realize,

not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500 (1965).

Al-Ahmed has not pleaded any facts that Twitter was aware of Abouammo or Alzabarah's activities prior to hiring them; that Twitter knew or should have known that they would become agents of the KSA; or that Twitter retained them after learning what they had done. To the contrary, Al-Ahmed acknowledges that Twitter was unaware of its employees' misconduct. FAC ¶ 19. Further, as soon as it became aware, Twitter removed Alzabarah, *see Abouammo*, ECF No. 53, ¶ 26(k) and (s), and Abouammo had already left the company by then. *Id.* ¶ 26(k). As Al-Ahmed has not alleged any facts that Twitter knew in advance or should have suspected that Abouammo or Alzabarah would become—or had become—agents of the KSA, his claims for negligent hiring and reckless endangerment should be dismissed.

### J.     Twitter's Terms of Service bars many of Al-Ahmed's claims.

Al-Ahmed's claims for breach of contract, negligent hiring, and breach of the implied covenant of good faith and fair dealing are all barred by Twitter's TOS. By signing up for Twitter, Al-Ahmed agreed that the TOS "govern[ed his] access to and use of [Twitter's] services." *See* RJN, Ex. 6N at 1, Exs. 6A-6M; *see also* FAC ¶ 37 (acknowledging Al-Ahmed's assent to the TOS). The TOS contains two provisions that are fatal to these claims.

*First*, Twitter's Limitation of Liability clause bars Al-Ahmed from asserting liability against Twitter for an "inability to access or use the [Twitter] services" and also for "unauthorized access, use or alteration of [his] transmissions or content" on any theory of liability, including contract or "tort (including negligence)." *See* RJN, Ex. 6N at 8-9.[15] While a limitation of liability clause may not exculpate a party from liability for intentional torts under California law, *see* Cal. Civ. Code § 1668, such a clause is otherwise fully enforceable, including

---

[15] Limitation of liability clauses "have long been recognized as valid in California." *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012) (involving contract and negligence claims); *see also Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (2015); *see also Darnaa, LLC v. Google LLC*, 756 F. App'x 674, 676 (9th Cir. 2018).

1391737

for contract and negligence-based claims.  *See Lewis*, 244 Cal. App. 4th at 125 (dismissing

plaintiff's breach of contract claim based on limitation of liability clause); *Bass v. Facebook,*

*Inc.*, 394 F. Supp. 3d 1024, 1038 (N.D. Cal. 2019) (acknowledging that such a clause may bar

negligence-based tort claims).  Accordingly, based on the Limitation of Liability clause in

Twitter's TOS, Al-Ahmed's breach of contract, breach of implied covenant of good faith and fair

dealing, and negligent hiring claims should be dismissed.

    *Second*, the TOS also gave Twitter the right to "suspend or terminate [Al-Ahmed's]

account or cease providing [Al-Ahmed] with all or part of the Services at any time for any or no

reason."  RJN, Ex. 6N at 16-17.  Thus, to the extent one of his Twitter accounts was suspended

"without explanation or warning," *see* FAC ¶ 21, such action was within Twitter's express

contractual rights.  Accordingly, the TOS provides a second basis to dismiss plaintiff's claims for

breach of contract and of the implied covenant of good faith and fair dealing.

## IV.    ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

    Alternatively, the Court should transfer this action to the United States District Court for

the Northern District of California.[16]  Since September 2009, every version of Twitter's TOS has

included a forum-selection clause requiring that "[a]ll claims, legal proceedings or litigation" or

"[a]ll disputes" "arising in connection with" or "relating to" Twitter's services be brought "solely

in the federal or state courts located in San Francisco County, California, United States."[17]

Twitter's TOS further requires that each user consent to personal jurisdiction and venue in those

courts, and waive "objection as to inconvenient forum."  RJN, Ex. 6N at 9, *see also* Exs. 6K-M.

---

[16] On a transfer motion, a court may consider evidence outside the complaint.  *See Everlast*
*World's Boxing Headquarters Corp. v. Ringside, Inc*., 928 F. Supp. 2d 735, 737 n.1 (S.D.N.Y.
2013).

[17] From September 2009 through September 2016, Twitter's TOS provided that "[a]ll claims,
legal proceedings or litigation arising in connection with [Twitter's services] will be brought
solely in San Francisco County, California."  RJN, Ex. 6A at 8, *see also* Exs. 6B-J.  From
September 2016 to the present, Twitter's TOS provided that "[a]ll disputes related to [the TOS]
or [Twitter's services] will be brought solely in the federal or state courts located in San
Francisco County, California." RJN, Ex. 6N at 9, *see also* Exs. 6K-M.

The United States Supreme Court has held that forum-selection clauses are presumptively valid as a matter of law.  *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-95 (1991); *see also Brittain v. Twitter Inc.*, No. CV-18-01714-PHX-DGC, 2019 WL 110967, at *4 (D. Ariz. Jan. 4, 2019) (holding Twitter's forum-selection clause "presumptively valid and enforceable"). Indeed, courts have recognized that enforcement of forum-selection clauses for Internet companies like Twitter is particularly important because their web-based services can be accessed nearly anywhere.  *See Miller v. Facebook*, No. 1:09-CV-2810-RLV, 2010 WL 9525523, at *1 (N.D. Ga. Jan. 15, 2010) ("[S]triking the forum selection clause could wreak havoc on the entire social-networking internet industry.").

Thus, where there is a valid forum-selection clause, the clause should be "given controlling weight in all but the most exceptional cases" and the standard 28 U.S.C. § 1404(a) analysis of private and public interests, does not apply.  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).  The plaintiff's choice of forum "merits no weight" and a court "should not consider arguments about the parties' private interests."  *Id.* at 63-64. Further, public-interest factors only defeat a transfer motion in the "most unusual cases as the 'interest of justice' is served by holding parties to their bargain."  *Id.* at 66.

Al-Ahmed, like all Twitter users, assented to the TOS and its forum-selection clause as a condition of registering his Twitter account and using the Twitter service.  FAC ¶¶ 37-38. Because all of his claims in this action arise "in connection with" or "relate to" Twitter services or Twitter itself, the forum-selection clause applies to the entire FAC.  Therefore, if this matter is not dismissed, it should be transferred to the Northern District of California.

## V.      CONCLUSION

For the reasons set forth above, Twitter respectfully requests that the Court dismiss the FAC in its entirety and with prejudice.  Alternatively, Twitter respectfully requests that this matter be transferred to the Northern District of California.

//

1391737

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  September 28, 2020          By:   */s/ Benjamin Berkowitz*
                                         BENJAMIN BERKOWITZ
                                         KHARI J. TILLERY
                                         ANJALI SRINIVASAN
                                         RYLEE KERCHER OLM
                                         633 Battery Street
                                         San Francisco, CA 94111-1809
                                         Telephone:  415 391 5400
                                         Facsimile:  415 397 7188
                                         bberkowitz@keker.com
                                         ktillery@keker.com
                                         asrinivasan@keker.com
                                         rolm@keker.com

                                         ALICE K. JUMP
                                         REAVIS PAGE JUMP LLP
                                         41 Madison Avenue
                                         41st Floor
                                         New York, NY 10010
                                         Telephone:  212-763-4100
                                         Facsimile:  212-763-4141
                                         ajump@rpjlaw.com

                                         Attorneys for Defendant TWITTER, INC.